# COMPOSITE EXHIBIT 1

Case Number: CACE-25-002412 Division: 02
Filing # 217215833 E-Filed 02/20/2025 12:28:01 PM

**FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

## I.   CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>SEVENTEENTH</u>  JUDICIAL CIRCUIT,
IN AND FOR <u>BROWARD</u>  COUNTY, FLORIDA

EMERALD MULTISPECIALITY PA
Plaintiff

Case # _____

Judge _____

vs.

AETNA HEALTH AND LIFE INSURANCE COMPANY, AETNA HEALTH ASSURANCE PENNSYLVANIA INC, AMERICAN CONTINENTAL INSURANCE CO, AETNA BETTER HEALTH OF FLORIDA INC, MERITAIN HEALTH
Defendant

## II.   AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

## III.   TYPE OF CASE      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☒ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☒ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

- 2 -

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

### COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**    **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**    **NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

   <u>2</u>

**VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
     ☐ yes
     ☒ no

**VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
     ☒ no
     ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
     ☒ yes
     ☐ no

**IX.**    **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
     ☐ yes
     ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Maria T. Santi</u>         Fla. Bar # <u>117564</u>
          Attorney or party                    (Bar # if attorney)

<u>Maria T. Santi</u>           <u>02/20/2025</u>
(type or print name)          Date

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

EMERALD MULTISPECIALITY P.A.,      Case No.: _____

      Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC., and
MERITAIN HEALTH.

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff, EMERALD MULTISPECIALITY P.A. (hereinafter "Plaintiff and/or

Medical Doctor"), through undersigned counsel, and sues Defendants, AETNA HEALTH AND

LIFE INSURANCE CO., AETNA HEALTH ASSURANCE PENNSYLVANIA, INC.,

AMERICAN CONTINENTAL INSURANCE CO., AETNA BETTER HEALTH OF FLORIDA,

INC., and MERITAIN HEALTH. (hereinafter "Defendants and/or Aetna companies"), and alleges:

### NATURE OF ACTION

1.    This is an action that concerns denial of health insurance claims submitted to the

Aetna companies by Plaintiff, a practice specialized in primary and urgent medical care ("the

Practice").

1

2.      The Practice is out of network with the Aetna companies, and thus, not subject to contract rates or provisions used to determine payment and/or reimbursement rates for any claims submitted by Plaintiff.

3.      During the COVID emergency Florida law and Federal law determined that various COVID related treatments were subject to unconditional approval. The Aetna companies failed to abide by applicable Florida law and instead did not pay claims or set rates of reimbursement that do not apply to the Practice.

## JURISDICTION AND VENUE

4.      This is a civil action for damages of more than Fifty-Thousand Dollars ($50,000.00), with an approximate principal amount in controversy of $269,542.52 exclusive of interest and attorney's fees and costs, and for other relief within the subject matter jurisdiction of this Court.

5.      This is an action that involves parties and property located within the venue of this Court, and venue is otherwise proper pursuant to Chapter 47, Florida Statutes.

6.      At all times material hereto, the cause of action accrued in Broward County, Florida because patients were treated in Broward, and Defendants are subject to the jurisdiction of this Court pursuant to section 47.501 of the Florida Statutes.

## PARTIES

7.      At all times material hereto, the Plaintiff is and was a Professional Association doing business in Broward County Florida and is *sui juris*.

8.      At all times material hereto, the Defendants, the Aetna companies, were companies authorized to, and doing business in the State of Florida, and more particularly in Broward County, Florida and are subject to the jurisdiction of this Court.

2

9.     At all times material hereto, Defendants, the Aetna companies, were subject to applicable provisions of the Florida Statutes, and state and federal laws with regards to reimbursement for medical services rendered during the COVID emergency.

10.     The Aetna companies had a duty to ensure that their standards were met, and policies and procedures were implemented and followed by their agents and employees and that health insurance claims were timely paid and administered in accordance with applicable laws.

## STATEMENT OF THE FACTS

11.     The Practice specializes in urgent and family care in Hollywood, FL which provides medical services to patients in private practice.

12.     The Practice is not contracted with the Aetna companies and is an Out-of-Network provider with the Aetna companies and thus provided medical services to patients as an Out-of-Network provider.

13.     During the COVID-19 Emergency the Practice provided medical services to Members of the Aetna companies insurance plan for monoclonal antibody treatment and COVID-19 Testing.

14.     As a result of the foregoing, multiple claims were submitted to the Aetna companies during the Dates of Service. See Exh. A.

15.     However, the claims remain unpaid. The Practice made multiple attempts to resolve these issues, to no avail. This includes submission of appeals and claims for underpayment.

16.     The Practice also provided COVID testing to patients at a rate of $80 per patient but no payment has been made. See Exh. A.

17.     The Practice provided IV services for COVID treatment to patients at a rate of $1,500 under code M0223 but no payment has been made. *See* Exh. A.

3

18.     The Practice provided IV services for COVID treatment to patients at a rate of $8,000 under code M0244 but no payment has been made. *See* Exh. A.

19.     The Practice provided IV services for COVID treatment to patients at a rate of $10,000 under code M0248 but no payment has been made. *See* Exh. A.

20.     The Patients were Members of the Aetna companies and receive health benefits from the Aetna companies through health insurance policies issued and/or administered by the Aetna companies.

21.     The Covid Services provided by the Practice were medically necessary and reasonable and were provided in accordance with the provisions of state and federal law and the Policies for care provided.

22.     Pursuant to the U.S. Government's COVID-19 federal emergency declarations, and Section 319 of the Publish Health Service Act, group health plans and individual health insurance plans were required to cover COVID-19 tests and testing-related services without cost sharing or prior authorization or other requirements. The coverage requirements apply regardless of whether or not patients and consumers obtain tests from participating providers. *See* Exh. B.

23.     Pursuant to various Emergency Use Authorizations ("EUA") issued by the Food and Drug Administration ("FDA"), the following products were approved as COVID Treatment protocols:

- M0223 - Bebtelovimab;
- M0244 - REGEN-COV;
- M0246 – Bamlanivimab and Etesevimab;
- M0248 – Sotrovimab.

*See* Exh. B.

24.     There is no basis for denial or non-payment of the claims at issue.

4

25. Additionally, in 2020, the Centers for Medicare and Medicaid Services issued a Memo stating that pursuant to Section 3713 of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, COVID-19 monoclonal antibody products would be considered COVID-19 vaccines for coverage purposes. *See* Exh. C.

26. As a result, to the extent the Aetna companies denied or failed to pay for Monoclonal Antibody Treatment on any basis, the mere fact that it is considered a vaccine under the Medicare Guidance as related to the CARES Act mandates payment of the treatment without condition. *See* Exh. C.

27. The Practice timely filed Claims for the medical services as listed in Exh. A.

28. The Practice timely filed Appeals for the claims at issue for the Patients for which medical services were provided.

29. Plaintiff, as an out of network provider with the Aetna companies, did not agree to accept discounted rates from the Aetna companies for its services and did not agree to be bound by the Aetna companies' rates or reimbursement schedules for the Claims.

30. Plaintiff is entitled to reimbursement for the full charges billed to the Aetna companies for the Claims.

31. The Aetna companies have wrongfully refused to pay and reimburse Plaintiff for the Claims at billed charges.

## COUNT I
## BREACH OF IMPLIED-IN-FACT CONTRACT

32. Plaintiff re-adopts and re-alleges and incorporates by reference paragraphs 1 through 31 as if fully set forth herein.

33. At all times material hereto, the Aetna companies had knowledge that Plaintiff was an out of network provider that provides medical services to its members.

34.     At all times material hereto, the Aetna companies had knowledge that there was a Covid Emergency and that Plaintiff was an out of network provider that would provide medical services to its members.

35.     Defendants knew that they were obligated to pay the Plaintiff by law for Covid testing and treatment in accordance with emergency use authorizations regardless of whether they are in-network or out of network and regardless of insurance coverage.

36.     The Aetna companies were aware of its obligation to out of network providers such as Plaintiff that provide Covid treatment and services to the Aetna companies Members.

37.     The Aetna companies are aware that Plaintiff provided services to the Members on the various Dates of Service with the reasonable expectation and understanding that services would be reimbursed by the Aetna companies.

38.     The Aetna companies knew that the Plaintiff, as an out of network provider with the Aetna companies and that Plaintiff did not agree to accept discounted rates from the Aetna companies for their services and did not agree to be bound by the Aetna companies' rates or reimbursement schedules for the Claims.

39.     With full knowledge of its obligations to cover the services provided to the Members, the Aetna companies approved some services and made partial payment for several Members but denied claims for the Dates of Service at issue and impliedly agreed to pay the Plaintiff the total charges. *See* Exh. A.

40.     The Aetna companies acknowledged its obligation to pay the Claims and is confirmed by the fact that the Aetna companies issued payment to Plaintiff for other Covid Claims.

41.     All conditions precedent have been met for the Defendant to perform its obligations under the implied contract.

6

42.     The Aetna companies breached its agreement with the Plaintiff by failing to pay the Plaintiff the total charges or the usual and customary, and reasonable provider charges for similar services in the community where the services were provided.

43.     As a result of the Aetna companies' breach of its implied contract to reimburse the Plaintiff the total charges or the usual and customary, and reasonable provider charges for similar services in the community where the services were provided, the Plaintiff has suffered damages in the amount of the unpaid balance for the billed charges for the medical services provided to the Members together with prejudgment interest.

WHEREFORE, Plaintiff prays that this Honorable Court will enter judgment against the Aetna companies for the unpaid billed charges, or in the alternative for the UCR of the billed charges; Taxable costs and interest to the Plaintiff; That this Court take jurisdiction of this action and all parties named in this Complaint, and that this Court permit Plaintiff to join in this action by appropriate amended pleading any such additional parties as may be necessary for a full and complete determination of Plaintiff's rights; and Award Plaintiff any such other relief as this Court deems just and proper.

## COUNT II
## DECLARATORY JUDGMENT

44.     Plaintiff re-adopts and re-alleges and incorporates by reference paragraphs 1 through 31 as if fully set forth herein.

45.     The Members policies and coverage with the Defendant were in full force and effect when the Members' Covid medical services were denied.

46.     The denial was in contravention of the Policy, in that, the Insured is entitled to payment of benefits under the policy for services received at the Practice.

7

47.     The services are covered pursuant to the terms of the Policy, and are not excluded under the Policy.

48.     The services are covered pursuant to the terms of the Policy, and are not excluded under state and federal mandates.

49.     The Aetna companies breached its contract with the Insured for its failure to provide coverage for the Covid medical services benefits services pursuant to the Policy.

50.     The Aetna companies breached its contract with the Insured for its failure to provide coverage for the Covid medical services benefits services pursuant to state and federal mandates.

51.     Under the terms of the Policy, the Aetna companies are required to make full payment of the Covid benefits.

52.     Pursuant to the U.S. Government's COVID-19 federal emergency declarations, and Section 319 of the Publish Health Service Act, group health plans and individual health insurance plans were required to cover COVID-19 tests and testing-related services without cost sharing or prior authorization or other requirements. The coverage requirements apply regardless of whether or not patients and consumers obtain tests from participating providers. *See* Exh. B.

53.     Pursuant to various Emergency Use Authorizations ("EUA") issued by the Food and Drug Administration ("FDA"), the following products were approved as COVID Treatment protocols:

- M0223 - Bebtelovimab;
- M0244 - REGEN-COV;
- M0246 – Bamlanivimab and Etesevimab;
- M0248 – Sotrovimab.

*See* Exh. B.

54.     There is no basis for denial or non-payment of the claims at issue.

55.     Additionally, in 2020, the Centers for Medicare and Medicaid Services issued a Memo stating that pursuant to Section 3713 of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, COVID-19 monoclonal antibody products would be considered COVID-19 vaccines for coverage purposes. *See* Exh. C.

56.     As a result, to the extent the Aetna companies denied or failed to pay for Monoclonal Antibody Treatment on any basis, the mere fact that it is considered a vaccine under the Medicare Guidance as related to the CARES Act mandates payment of the treatment without condition. *See* Exh. C.

57.     The Practice timely filed Claims for the medical services as listed in Exh. A.

58.     The Practice timely filed Appeals for the claims at issue for the Patients for which medical services were provided.

59.     Plaintiff, as an out of network provider with the Aetna companies, did not agree to accept discounted rates from the Aetna companies for its services and did not agree to be bound by the Aetna companies' rates or reimbursement schedules for the Claims.

60.     Plaintiff has a bona fide, actual, present and practical need for an objective determination to the actual facts so the Court can make a determination as to whether its rights were violated under the Policy and the Insured's rights to Covid benefits under the Policy.

61.     If the Court decides that Defendants, the Aetna companies, violated the Members and the Plaintiff's Rights under the Policy for  benefits, then the Defendants shall be obligated to overturn its original coverage determination for the Covid Claims.

62.     If the Aetna companies overturns its coverage determination, it would then be obligated to approve and pay for the claims. *See* Exh. A.

63.     Under Chapter 86, Fla. Stat., Plaintiff is entitled to have any doubt and/or uncertainty removed regarding the existence or non-existence of a right, status, immunity, power or privilege.

64.     Therefore, Plaintiff seeks a determination and declaration as afforded under Fla. Stat. 86.011. Plaintiff also seeks a determination and declaration as afforded under § 86.021, Fla. Stat., which states in pertinent part:

> 86.021 Power to construe.——Any person claiming to be interested or who may be in doubt about his or her rights under a deed, will, **contract**, or other article, memorandum, or instrument in writing or whose rights, status, or other equitable or legal relations are affected by a statute, or any regulation made under statutory authority, or by municipal ordinance, contract, deed, will, franchise, or other article, memorandum, or instrument in writing may have determined any question of construction or validity arising under such statute, regulation, municipal ordinance, contract, deed, will, franchise, or other article, memorandum, or instrument in writing, or any part thereof, and obtain a declaration of rights, status, or other equitable or legal relations thereunder.

65.     That in reading those provisions of Chapter 86, Fla. Stat., *in pari materia*, Plaintiff is asking the Court to declare the rights of the Plaintiff under the terms of the Policy, state and federal law related to the facts and violations claimed.

66.     The relief sought by Plaintiff relates to a present, ascertainable state of facts and present controversy.

67.     The Plaintiff's rights and the Defendants' obligations are dependent upon a determination of those actual facts.

68.     Plaintiff is not merely seeking an advisory opinion.

69.     Plaintiff is not seeking monetary relief in this action, rather, Plaintiff seeks a speedy determination and declaration of his rights under the declaratory judgment statutes, rather than proceed under another form of remedy, pursuant to §86.111, Fla. Stat. to ensure that he can receive medical treatment in a timely fashion.

10

70.     Plaintiff further seeks trial by jury of all issues triable as a matter of right by a jury pursuant to §86.071, Fla. Stat.

71.     All conditions precedent to the filing of this action have been complied with, met or otherwise waived.

**WHEREFORE**, Plaintiff prays that this Honorable Court will enter judgment against the Aetna companies for the unpaid full billed charges, or in the alternative for the UCR of the billed charges; Taxable costs and interest to the Plaintiff; That this Court take jurisdiction of this action and all parties named in this Complaint, and that this Court permit Plaintiff to join in this action by appropriate amended pleading any such additional parties as may be necessary for a full and complete determination of Plaintiff's rights; and Award Plaintiff any such other relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES TRIABLE AS A MATTER OF RIGHT BY A JURY.**

Respectfully submitted,

**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8950 SW 74th Court, Suite 2201
Miami, FL 33156
Phone: (305) 677-2292
Fax: (305) 677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

By:     /s/ Maria T. Santi
        **MARIA T. SANTI, ESQUIRE**
        Florida Bar No.:  117564

11

# EXHIBIT "A"

| Primary insurance short name | Aetna | | | | | | |
|---|---|---|---|---|---|---|---|
| **Billing company (full name)** | **Patient name** | **Patient ID** | **Service ID** | **DoS** | **CPT** | **Sum of Charge** | **Sum of Payment from pri. ins.** | **Sum of Amount Due** |

| Billing company (full name) | Patient name | Patient ID | Service ID | DoS | CPT | Sum of Charge | Sum of Payment from pri. ins. | Sum of Amount Due |
|---|---|---|---|---|---|---|---|---|
| Emerald Multispecialty PA | | 219492 | 2870251 | 6/15/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 276776 | 3249253 | 1/19/2022 | 0 | $0.01 | $0.00 | $0.01 |
| | | 139629 | 1507824 | 1/19/2022 | M0244 | $8,000.00 | $0.00 | $8,000.00 |
| | | 139050 | 3151612 | 8/24/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 199713 | 2579710 | 4/7/2022 | M0223 | $1,120.50 | $0.00 | $1,120.50 |
| | | 264833 | 3151926 | 8/24/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 210226 | 2736051 | 5/18/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 123632 | 1441864 | 12/26/2021 | M0244 | $8,000.00 | $0.00 | $8,000.00 |
| | | 210286 | 2737850 | 5/19/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 246819 | 3028812 | 7/27/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 242453 | 3011414 | 7/22/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 208389 | 2707869 | 5/9/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 125145 | 1560505 | 1/4/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 225116 | 2939523 | 6/26/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 225121 | 2939533 | 6/26/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 242204 | 3010637 | 7/20/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 147101 | 1537575 | 1/17/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 223457 | 2925828 | 6/28/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 191567 | 2760526 | 5/8/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 341805 | 1618517 | 2/1/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 242249 | 3010820 | 7/22/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 255140 | 3082752 | 8/2/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 171227 | 1634341 | 2/21/2022 | M0248 | $10,000.00 | $0.00 | $10,000.00 |
| | | 242184 | 3010587 | 7/21/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 124997 | 1543984 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 124996 | 1543975 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 216996 | 2980939 | 2/23/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 2980945 | 2/24/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 2980949 | 2/25/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 242207 | 3010640 | 7/21/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 202793 | 2628823 | 3/30/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 141456 | 1514984 | 1/24/2022 | M0248 | $10,000.00 | $0.00 | $10,000.00 |
| | | 213529 | 2791943 | 5/22/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 239237 | 2995219 | 7/13/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 278704 | 3259732 | 8/12/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 213549 | 2792195 | 5/22/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 226045 | 2941657 | 7/3/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 217870 | 2845754 | 6/7/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 279911 | 3262344 | 8/1/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 125765 | 1452708 | 12/26/2021 | M0244 | $8,000.00 | $0.00 | $8,000.00 |
| | | 123664 | 1441909 | 12/26/2021 | M0244 | $8,000.00 | $0.00 | $8,000.00 |
| | | 129350 | 1452715 | 12/26/2021 | M0244 | $8,000.00 | $0.00 | $8,000.00 |
| | | 123668 | 1441913 | 12/26/2021 | M0244 | $8,000.00 | $0.00 | $8,000.00 |
| | | 182069 | 1692477 | 2/24/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 181472 | 1690090 | 3/1/2022 | M0248 | $10,000.00 | $0.00 | $10,000.00 |
| | | 187497 | 1765079 | 12/22/2021 | M0244 | $10,000.00 | $0.00 | $10,000.00 |
| | | 200452 | 2594092 | 4/14/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 262745 | 3129125 | 8/19/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 218075 | 2848306 | 6/9/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 139085 | 1504258 | 1/2/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 205503 | 2663222 | 1/12/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | 217411 | 2836272 | 6/2/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 223433 | 2925765 | 6/28/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 123434 | 1441650 | 12/28/2021 | M0244 | $8,000.00 | $0.00 | $8,000.00 |
| | | 153335 | 1561385 | 2/5/2022 | M0248 | $10,000.00 | $0.00 | $10,000.00 |
| | | 219448 | 2870131 | 6/14/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 257853 | 3096005 | 8/9/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 279395 | 3261488 | 8/15/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 204591 | 2648648 | 4/28/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 207342 | 2686341 | 5/6/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 258893 | 3101952 | 8/9/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 207996 | 2697181 | 5/5/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | 181473 | 1690102 | 3/1/2022 | M0248 | $10,000.00 | $0.00 | $10,000.00 |
| | | 214380 | 2799087 | 4/10/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 214287 | 2946919 | 5/27/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 277234 | 3253302 | 1/22/2022 | 0 | $0.01 | $0.00 | $0.01 |
| | | 130665 | 1477002 | 1/6/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 124962 | 1543598 | 12/30/2021 | 87811 | $80.00 | $0.00 | $80.00 |

| Provider | | | Date | Code | Amount 1 | Amount 2 | Amount 3 |
|---|---|---|---|---|---|---|---|
| **Emerald Multispecialty PA** | 124962 | 1543598 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | 124964 | 1543630 | 12/30/2021 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 187342 | 1764069 | 3/15/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 130654 | 1540438 | 1/6/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 130653 | 1540434 | 1/6/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 149353 | 1546107 | 1/11/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 1561672 | 1/11/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 137383 | 1497603 | 1/5/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 148017 | 1561347 | 1/11/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 219354 | 2869789 | 6/13/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | 213507 | 2791564 | 5/23/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | 123431 | 1441646 | 12/28/2021 | M0244 | $8,000.00 | $0.00 | $8,000.00 |
| | 215506 | 2809279 | 5/29/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | 215503 | 2809252 | 5/29/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | 153936 | 1562880 | 1/11/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 126397 | 1458558 | 12/24/2021 | M0244 | $10,000.00 | $0.00 | $10,000.00 |
| | 126398 | 1458559 | 12/24/2021 | M0244 | $8,000.00 | $0.00 | $8,000.00 |
| | 153108 | 1560674 | 1/30/2022 | M0248 | $10,000.00 | $0.00 | $10,000.00 |
| | 221286 | 2893265 | 6/21/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | 124955 | 1543931 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | 124953 | 1543918 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | 217296 | 2835249 | 5/31/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | 262058 | 3124223 | 8/15/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | 138733 | 1502813 | 12/30/2021 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 217804 | 2845341 | 6/7/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| **Simon F Medical Services PC** | 181188 | 1769641 | 3/2/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 169260 | 1627806 | 1/11/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 145768 | 1526603 | 1/11/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 133282 | 1483035 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | 188874 | 1773480 | 3/1/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 136877 | 1495573 | 1/4/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 188537 | 1770509 | 2/23/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 1771181 | 3/1/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 1772078 | 3/3/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 146121 | 1526962 | 1/4/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 192710 | 1798329 | 2/18/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 143864 | 1526375 | 1/11/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 134911 | 1487216 | 1/3/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 187449 | 1764669 | 3/3/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 132726 | 1485117 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | 132724 | 1485115 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | 138540 | 1479290 | 12/29/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | 143700 | 1526180 | 1/11/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 133289 | 1483051 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | 146088 | 1524951 | 1/4/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 212129 | 2764435 | 4/15/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 145782 | 1526380 | 1/11/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 146165 | 1526357 | 1/4/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 146153 | 1526409 | 1/4/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | 131533 | 1483348 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | 191711 | 1795756 | 1/25/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | 131306 | 1479385 | 12/29/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | 133894 | 1485104 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| **(blank)** | 208834 | 2718413 | 3/11/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | | 2831796 | 5/11/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 268685 | 3183545 | 8/31/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 280458 | 3263587 | 8/12/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 259089 | 3102799 | 8/9/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 255142 | 3082755 | 8/2/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 203627 | 3591894 | 11/3/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 280443 | 3263474 | 8/18/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 239590 | 2996585 | 7/15/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 163252 | 1610171 | 2/1/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | | 1612795 | 2/8/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 227247 | 2945568 | 7/6/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 255092 | 3082576 | 8/3/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 278981 | 3260767 | 8/22/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 255363 | 3258357 | 8/11/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | | 3261284 | 8/23/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 203796 | 3591958 | 10/26/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 203798 | 3544487 | 9/6/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 279661 | 3261970 | 8/24/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 281618 | 3272163 | 7/30/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 239665 | 2996850 | 7/15/2022 | (blank) | $0.00 | $0.00 | $0.00 |

| (blank) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 168013 | 2515195 | 2/22/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 280191 | 3262841 | 8/1/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 203760 | 3593027 | 9/14/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 278484 | 3259341 | 8/13/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | | 3262714 | 8/26/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 211615 | 2760039 | 5/9/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 277801 | 3258007 | 8/1/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | 278213 | 3258796 | 7/28/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| Grand Total | | | | | $218,560.52 | $0.00 | $218,560.52 |

Primary insurance short name    Aetna PA

| Billing company (full name) | Patient name | Patient ID | Service IC | DoS | CPT | Sum of Charge | Sum of Payment from pri. ins. | Sum of Amount Due |
|---|---|---|---|---|---|---|---|---|
| Emerald Multispecialty PA | | 192082 | 1796798 | 2/3/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 191210 | 1794431 | 2/19/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 191139 | 1794087 | 2/11/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 191278 | 1796265 | 2/7/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 192021 | 1796620 | 2/3/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 191736 | 1795841 | 1/25/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 192385 | 1797702 | 3/2/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 192142 | 1796947 | 2/2/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 191547 | 1795198 | 3/5/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| Simon F Medical Services PC | | 214062 | 2797544 | 4/13/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 191186 | 1794334 | 2/19/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 211574 | 2759791 | 3/28/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 192251 | 2764098 | 5/15/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 215185 | 2807724 | 4/13/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 211638 | 2760229 | 5/9/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 214152 | 2797852 | 4/13/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 215344 | 2808188 | 4/13/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 191214 | 1794446 | 2/19/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| (blank) | | 212017 | 2763495 | 5/17/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | | | 2764560 | 5/11/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| | | 211615 | 2760827 | 5/2/2022 | (blank) | $0.00 | $0.00 | $0.00 |
| Grand Tot | | | | | | $2,964.00 | $0.00 | $2,964.00 |

Primary insurance short name      Aetna NJ

| Billing company (full name) | Patient name | Patient ID | Service ID | DoS | CPT | Sum of Charge | Sum of Payment from pri. ins. | Sum of Amount Due |
|---|---|---|---|---|---|---|---|---|
| Simon F Medical Services PC | | 192596 | 1798166 | 1/22/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 182134 | 1692609 | 2/24/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| Grand Total | | | | | | $276.00 | $0.00 | $276.00 |

| Primary insurance short name | Aetna Meritain Health | | | | | | |

| Billing company (full name) | Patient name | Patient ID | Service ID | DoS | CPT | Sum of Charge | Sum of Payment from pri. ins. | Sum of Amount Due |
|---|---|---|---|---|---|---|---|---|
| Emerald Multispecialty PA | | 226615 | 2943162 | 7/5/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 226614 | 2943154 | 7/5/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| Simon F Medical Services PC | | 192015 | 1796605 | 1/21/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 134833 | 1487123 | 1/3/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 136776 | 1495425 | 1/4/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 136777 | 1495427 | 1/4/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| Grand Total | | | | | | $3,472.00 | $0.00 | $3,472.00 |

| Primary insurance short name | Aetna Better Health - FL | | | | | | |

| Billing company (full name) | Patient name | Patient ID | Service IC | DoS | CPT | Sum of Charge | Sum of Payment from pri. ins. | Sum of Amount Due |
|---|---|---|---|---|---|---|---|---|
| Emerald Multispecialty PA | | 277783 | 3257981 | 8/22/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 278412 | 3259209 | 8/25/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 262049 | 3124192 | 8/16/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 154074 | 1563215 | 2/5/2022 | M0248 | $10,000.00 | $0.00 | $10,000.00 |
| | | 288864 | 3260293 | 8/14/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 280383 | 3263303 | 8/18/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 148638 | 1543583 | 12/26/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 279271 | 3261250 | 8/23/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 194758 | 2491546 | 3/23/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 278080 | 3258559 | 7/27/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 278091 | 3258574 | 7/27/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 278335 | 3259044 | 8/11/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 258175 | 3097655 | 8/8/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 279426 | 3261545 | 8/23/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 148787 | 1544110 | 12/26/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 1560136 | 1/4/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 133034 | 1482526 | 1/4/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 279183 | 3261101 | 7/30/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 277696 | 3257834 | 7/28/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 162763 | 1609648 | 1/20/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 279734 | 3262090 | 8/1/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 257922 | 3096419 | 8/7/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 257894 | 3096128 | 8/6/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 3259519 | 8/12/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 279556 | 3261801 | 8/13/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 258246 | 3097218 | 8/7/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 3258956 | 8/12/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 279146 | 3261042 | 8/24/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 279133 | 3261020 | 8/24/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 278454 | 3259286 | 8/17/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 278548 | 3259455 | 8/12/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 278257 | 3258900 | 8/12/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 277627 | 3257728 | 7/27/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 3259357 | 8/16/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 265605 | 3157631 | 8/25/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 279327 | 3261335 | 8/19/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 138732 | 1502810 | 12/30/2021 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 159048 | 1580179 | 2/10/2022 | M0248 | $10,000.00 | $0.00 | $10,000.00 |
| | | 258842 | 3101688 | 8/8/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 3259074 | 7/28/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 258839 | 3101677 | 8/8/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 3259171 | 7/28/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 182509 | 1693444 | 2/27/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 186433 | 2883047 | 6/12/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 265592 | 3157582 | 8/25/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 3258685 | 8/24/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 163699 | 1610658 | 1/22/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 267280 | 3168084 | 8/27/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 277860 | 3258114 | 7/27/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 213626 | 3249936 | 5/25/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 214253 | 2792591 | 5/25/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 264889 | 3152220 | 8/24/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 219510 | 2870295 | 6/14/2022 | M0223 | $1,500.00 | $0.00 | $1,500.00 |
| | | 278129 | 3258637 | 8/24/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 3259136 | 8/17/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 278135 | 3258648 | 8/24/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 3259176 | 8/17/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 259277 | 3102042 | 8/9/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 279723 | 3262068 | 8/30/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 280141 | 3262760 | 7/31/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 278451 | 3259278 | 8/22/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 268085 | 3175657 | 8/29/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 279488 | 3261674 | 8/23/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 3262403 | 8/29/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 268624 | 3183218 | 8/30/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 268625 | 3183222 | 8/30/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 258935 | 3102339 | 8/9/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 164530 | 1611656 | 2/3/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 132830 | 1481887 | 1/3/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 133209 | 1482859 | 1/3/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 133108 | 1482661 | 1/3/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 133116 | 1482679 | 1/3/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| | | 133121 | 1482712 | 1/3/2022 | 87811 | $80.00 | $0.00 | $80.00 |

**Emerald Multispecialty PA**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 133121 | 1482712 | 1/3/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 255179 | 3082861 | 8/3/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 279402 | 3261503 | 8/15/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 124711 | 1478022 | 12/30/2021 | 99211 | $98.00 | | $0.00 | $98.00 |
| | 1693564 | 3/1/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 124710 | 1477998 | 12/30/2021 | 99211 | $98.00 | | $0.00 | $98.00 |
| | 1570553 | 1/6/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| | 1693556 | 3/1/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 130998 | 1561844 | 1/5/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| | 1693547 | 3/1/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 257898 | 3096144 | 8/6/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| | 3259247 | 8/12/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 256302 | 3087310 | 8/2/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 278954 | 3260717 | 8/14/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 279015 | 3260817 | 7/30/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 279021 | 3260831 | 7/30/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 279006 | 3260805 | 7/30/2022 | 87811 | $80.00 | | $0.00 | $80.00 |
| | | | 99211 | $98.00 | | $0.00 | $98.00 |
| 279118 | 3260990 | 7/30/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 279570 | 3261827 | 8/16/2022 | 87811 | $80.00 | | $0.00 | $80.00 |
| | | | 99211 | $98.00 | | $0.00 | $98.00 |
| 280157 | 3262778 | 8/26/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 280144 | 3262763 | 8/26/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 153410 | 1561605 | 1/6/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 134598 | 1486588 | 1/5/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 258685 | 3097192 | 8/8/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 277688 | 3257821 | 8/19/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 255391 | 3083179 | 8/3/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| | 3095528 | 8/6/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| | 3101741 | 8/8/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 256871 | 3089626 | 8/4/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 278716 | 3259756 | 8/17/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| | 3261123 | 8/21/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 226664 | 2943408 | 7/5/2022 | M0223 | $1,500.00 | | $0.00 | $1,500.00 |
| 258018 | 3097031 | 8/8/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 138448 | 1501685 | 12/30/2021 | 99211 | $98.00 | | $0.00 | $98.00 |
| 246674 | 3028645 | 7/27/2022 | M0223 | $1,500.00 | | $0.00 | $1,500.00 |
| 124274 | 1447351 | 12/27/2021 | 99211 | $98.00 | | $0.00 | $98.00 |
| 124269 | 1447345 | 12/27/2021 | 99211 | $98.00 | | $0.00 | $98.00 |
| 226621 | 2943199 | 7/5/2022 | M0223 | $1,500.00 | | $0.00 | $1,500.00 |
| 278372 | 3259115 | 8/12/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 256333 | 3087445 | 8/2/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 256336 | 3087449 | 8/2/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 278687 | 3259703 | 8/11/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 280546 | 3260839 | 8/26/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 259117 | 3102909 | 8/10/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 256343 | 3087462 | 8/2/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 256907 | 3089725 | 8/4/2022 | 99211 | $98.00 | | $0.00 | $98.00 |
| 148975 | 1544433 | 12/26/2021 | 99211 | $98.00 | | $0.00 | $98.00 |
| 148971 | 1544425 | 12/26/2021 | 99211 | $98.00 | | $0.00 | $98.00 |
| | **Grand Total** | | | **$42,036.00** | | **$0.00** | **$42,036.00** |

| Primary insurance short name | Aetna ACI | | | | | | |
|---|---|---|---|---|---|---|---|
| **Billing company (full name)** | **Patient name** | **Patient ID** | **Service IC** | **DoS** | **CPT** | **Sum of Charge** | **Sum of Payment from pri. ins.** | **Sum of Amount Due** |

| Billing company (full name) | Patient name | Patient ID | Service IC | DoS | CPT | Sum of Charge | Sum of Payment from pri. ins. | Sum of Amount Due |
|---|---|---|---|---|---|---|---|---|
| **Emerald Multispecialty PA** | | 161843 | 1608576 | 1/20/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 161823 | 1608550 | 1/20/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 165799 | 1613662 | 2/14/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 166086 | 1614068 | 2/15/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 163640 | 1610592 | 2/1/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | | 1613106 | 2/8/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 166120 | 1614124 | 2/15/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 166261 | 1614329 | 2/15/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 163731 | 1610697 | 1/22/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 166210 | 1614253 | 2/15/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 166443 | 1614646 | 2/16/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| **Simon F Medical Services PC** | | 165923 | 1613850 | 2/15/2022 | 87811 | $80.00 | $0.00 | $80.00 |
| | | | | | 99211 | $98.00 | $0.00 | $98.00 |
| | | 163773 | 1611290 | 1/19/2022 | 99211 | $98.00 | $0.00 | $98.00 |
| **Grand Total** | | | | | | $2,234.00 | $0.00 | $2,234.00 |

# EXHIBIT "B"



EUA 111

**EMERGENCY USE AUTHORIZATION-
REVISED FACT SHEETS**

Eli Lilly and Company
Attention: Jennifer Riddle Camp
Associate Director-Global Regulatory Affairs-North America
Lilly Corporate Center Drop Code 2543
Indianapolis, IN 46285

Dear Ms. Riddle Camp:

Please refer to your Emergency Use Authorization (EUA) for bebtelovimab for the treatment of mild-to-moderate coronavirus disease 2019 (COVID-19) in certain adults and pediatric patients who are at high-risk for progression to severe COVID-19, including hospitalization or death.

We refer to the action dated March 25, 2022 incorporating the following changes to the Fact Sheet for Health Care Providers (HCPs):

- Changes to Section 2.3 Dosage and Administration to include the required administration materials based on questions from HCPs regarding the need for the extension sets
- Updates to Table 4 in Section 12.4 Microbiology to include Omicron [+R346K] BA.1.1 and P.1 authentic virus data.

We also refer to your communication dated March 30, 2022 noting that the March 25, 2022 authorized HCP factsheet contained an inadvertent error omitting a footnote to Table 3.

The updated Fact Sheet for Health Care Providers is attached to this correspondence for your reference with March 30, 2022 as the new revised date.

By submitting these amendments for review by the Food and Drug Administration (FDA), you have complied with the Conditions of Authorization stated in the February 11, 2022, letter authorizing the emergency use of bebtelovimab for the treatment of mild-to-moderate coronavirus disease 2019 (COVID-19) in certain adults and pediatric patients who are at high-risk for progression to severe COVID-19, including hospitalization or death.

Sincerely,

EUA 111
Page 2

--/S/--

Alicia Moruf, PharmD, MPH, RAC-US
Regulatory Project Manager
Antivirals Group
Division of Regulatory Operations for
Infectious Diseases
Office of Regulatory Operations
Center for Drug Evaluation and Research

ENCLOSURE(S):
- EUA Fact Sheets
  - Fact Sheet for Health Care Providers

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

Reference ID: 4961105



January 24, 2022

Regeneron Pharmaceuticals, Inc.
Attention: Yunji Kim, PharmD
Director, Regulatory Affairs
777 Old Saw Mill River Road
Tarrytown, NY 10591

RE:     Emergency Use Authorization 091

Dear Dr. Kim:

On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Act, the Secretary of the
Department of Health and Human Services (HHS) determined that there is a public health
emergency that has a significant potential to affect national security or the health and security of
United States citizens living abroad, and that involves the virus that causes coronavirus disease
2019 (COVID-19).[1]  On the basis of such determination, the Secretary of HHS on March 27,
2020, declared that circumstances exist justifying the authorization of emergency use of drugs
and biological products during the COVID-19 pandemic, pursuant to Section 564 of the Federal
Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 360bbb-3), subject to terms of any
authorization issued under that section.[2]

On November 21, 2020, the Food and Drug Administration (FDA) issued an Emergency Use
Authorization (EUA) for emergency use of REGEN-COV (casirivimab and imdevimab,
administered together)[3] for the treatment of mild to moderate COVID-19 in adults and pediatric
patients (12 years of age and older weighing at least 40 kg) with positive results of direct SARS-
CoV-2 viral testing, and who are at high risk for progressing to severe COVID-19 and/or
hospitalization. Casirivimab and imdevimab are recombinant human IgG1 monoclonal
antibodies that target the receptor binding domain of the spike protein of SARS-CoV-2. They are
investigational drugs and are not approved for any indication.

---

[1] U.S. Department of Health and Human Services, *Determination of a Public Health Emergency and Declaration
that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and
Cosmetic Act, 21 U.S.C. § 360bbb-3.* February 4, 2020.
[2] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations
Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*, 85 FR 18250
(April 1, 2020).
[3] The November 21, 2020 EUA referred to the authorized product as "casirivimab and imdevimab, administered
together". Regeneron subsequently requested, and FDA concurred, that the authorized labeling be revised to add
references to authorized products' trade name, "REGEN-COV".

Page 2 – Regeneron Pharmaceuticals, Inc.

FDA reissued the Letter of Authorization on the following dates: February 3, 2021,[4] February 25, 2021,[5] June 3, 2021,[6] July 30, 2021,[7] September 9, 2021,[8] and November 17, 2021.[9]

On January 24, 2022, again having concluded that revising this EUA is appropriate to protect the public health or safety under section 564(g)(2) of the Act, FDA is reissuing the November 17, 2021 letter in its entirety, to further limit the use of REGEN-COV for treatment of COVID-19 or as post-exposure prophylaxis of COVID-19 to exclude geographic regions where, based on available information including variant susceptibility to this drug and regional variant frequency, infection or exposure is likely due to a variant that is non-susceptible to REGEN-COV. Corresponding revisions have also been made to the authorized Fact Sheets.

Based on the review of the analysis of phase 3 data from COV-2067[10] (NCT04425629), a phase 1/2/3 randomized, double-blind, placebo-controlled trial evaluating the safety and efficacy of a single intravenous infusion of 600 mg casirivimab and 600 mg imdevimab in outpatients (non-hospitalized) with SARS-CoV-2 infection, it is reasonable to believe that REGEN-COV may be effective for the treatment of mild to moderate COVID-19 in adults and pediatric patients (12 years of age and older weighing at least 40 kg) with positive results of direct SARS-CoV-2 viral

---

[4] In the February 3, 2021 revision, FDA revised the condition on requesting changes to this authorization, including changes to the authorized Fact Sheets. New conditions were also incorporated relating to the development of instructional or educational materials, as well as certain mandatory reporting requirements for healthcare facilities and providers. In addition to certain editorial and/or clarifying revisions, the Fact Sheet for Healthcare Providers was revised to include information on the new mandatory reporting requirements on therapeutics information and utilization data for healthcare facilities and providers. Updated safety information and details on possible side effects were also incorporated into the authorized Fact Sheets.

[5] In the February 25, 2021 revision, FDA revised the condition on instructional and educational materials. New conditions were also incorporated on the establishment of a process for monitoring genomic databases for the emergence of global viral variants of SARS-CoV-2 and the assessment, if requested by FDA, of the activity of the authorized REGEN-COV against any global SARS-CoV-2 variant(s) of interest.

[6] In the June 3, 2021 revision, FDA revised the authorized use statement for REGEN-COV. Additionally, FDA authorized a change in dosing of REGEN-COV from 2400 mg (1200 mg casirivimab and 1200 mg imdevimab) to 1200 mg (600 mg casirivimab and 600 mg imdevimab), and the addition of a new presentation consisting of a single vial containing casirivimab and imdevimab co-formulated in a 1:1 ratio for either intravenous infusion or subcutaneous injection. New conditions were incorporated on the provision of samples of the authorized REGEN-COV to the U.S. Department of Health and Human Services, upon request, and the submission of certain genomic sequencing and virology information to the FDA by a specified date. Revisions to existing conditions on advertising and promotion and manufacturing practices and other editorial changes were also incorporated.

[7] In the July 30, 2021 revision, FDA authorized REGEN-COV for emergency use as post-exposure prophylaxis for COVID-19 in certain adults and pediatric individuals. Clarifying revisions to the conditions on good manufacturing practices as well as advertising and promotion were also incorporated.

[8] In the September 9, 2021 revision, FDA authorized a co-packaged presentation of REGEN-COV which consists of individual vials of both casirivimab and imdevimab inside a single carton. FDA also authorized a document entitled *Casirivimab and Imdevimab Co-Packaged Product Quick Reference Guide* that must accompany in hardcopy format the authorized co-packaged formulation of REGEN-COV that is labeled "For pandemic use". Revisions to the Fact Sheet for Healthcare Providers associated with the co-packaged presentation of REGEN-COV and clarifying revisions on the preparation of more than one dose from a single-dose vial were also incorporated.

[9] In the November 17, 2021 revision, FDA revised the product description in this Letter of Authorization with updated storage and handling information for the authorized dose pack bags of REGEN-COV, co-packaged REGEN-COV, and subcutaneous injection presentation of REGEN-COV. Corresponding revisions on storage and handling of the subcutaneous injection presentation of REGEN-COV and minor revisions to section 15 ("Virology") were also incorporated in the Fact Sheet for Healthcare Providers.

[10] Referred to as trial R10933-10987-COV-2067 in previous iterations of this Letter of Authorization.

Page 3 – Regeneron Pharmaceuticals, Inc.

testing, and who are at high risk for progression to severe COVID-19, including hospitalization or death, and that, when used under the conditions described in this authorization, the known and potential benefits of REGEN-COV outweigh the known and potential risks of such product.

Additionally, based on the review of the topline analysis of phase 3 data from COV-2069 (NCT04452318), a phase 3 randomized, double-blind, placebo-controlled trial in household contacts with close exposure to a household member known to be infected with SARS-CoV-2 (index case), but who were themselves asymptomatic; and the analysis of phase 1 data from COV-2093 (NCT 04519437), an ongoing, phase 1, randomized, double-blind, placebo-controlled clinical trial assessing the safety and pharmacokinetics of repeat subcutaneous doses of REGEN-COV in subjects who are SARS-CoV-2 negative at baseline, it is reasonable to believe that REGEN-COV may be effective for use as post-exposure prophylaxis of COVID-19 in individuals who are at high risk for progression to severe COVID-19, including hospitalization or death, as described in the Scope of Authorization (Section II), and that, when used under such conditions, the known and potential benefits of REGEN-COV outweigh the known and potential risks of such product.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of REGEN-COV for treatment and as post-exposure prophylaxis of COVID-19, as described in the Scope of Authorization (Section II) and subject to the terms of this authorization.

## I.      Criteria for Issuance of Authorization

I have concluded that the emergency use of REGEN-COV for treatment and as post-exposure prophylaxis of COVID-19, when administered as described in the Scope of Authorization (Section II), meets the criteria for issuance of an authorization under Section 564(c) of the Act, because:

1. SARS-CoV-2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

2. Based on the totality of scientific evidence available to FDA, it is reasonable to believe the following:

   • REGEN-COV may be effective for the treatment of mild to moderate COVID-19 in adults and pediatric patients (12 years of age and older weighing at least 40 kg) with positive results of direct SARS-CoV-2 viral testing, and who are at high risk for progression to severe COVID-19, including hospitalization or death, as further described in the Scope of Authorization (Section II)

   • REGEN-COV may be effective for use as post-exposure prophylaxis of COVID-19 in individuals who are at high risk for progression to severe COVID-19, including hospitalization or death, as further described in the Scope of Authorization (Section II)

Page 4 – Regeneron Pharmaceuticals, Inc.

And that, when used under the conditions described in the Scope of Authorization (Section II), the known and potential benefits of REGEN-COV outweigh the known and potential risks of such products; and

3. There is no adequate, approved, and available alternative to the emergency use of REGEN-COV for treatment and as post-exposure prophylaxis of COVID-19, as described in the Scope of Authorization (Section II).[11]

## II.    Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited as follows:

- Distribution of the authorized REGEN-COV will be controlled by the United States (U.S.) Government for use consistent with the terms and conditions of this EUA. Regeneron will supply REGEN-COV to authorized distributor(s)[12], who will distribute to healthcare facilities or healthcare providers as directed by the U.S. Government, in collaboration with state and local government authorities as needed;

*Treatment of COVID-19*

- REGEN-COV will be used only by healthcare providers to treat mild to moderate COVID-19 in adults and pediatric patients (12 years of age and older weighing at least 40 kg) with positive results of direct SARS-CoV-2 viral testing, and who are at high risk for progressing to severe COVID-19, including hospitalization or death;

  The monoclonal antibodies that comprise REGEN-COV, casirivimab and imdevimab, may only be administered together;

- REGEN-COV is **not** authorized for use in the following patient populations[13]:
    - Adults or pediatric patients who are hospitalized due to COVID-19, or
    - Adults or pediatric patients who require oxygen therapy due to COVID-19, or
    - Adults or pediatric patients who require an increase in baseline oxygen flow rate due to COVID-19 in those patients on chronic oxygen therapy due to underlying non-COVID-19-related comorbidity.

- REGEN-COV is **<u>not</u>** authorized for treatment of mild to moderate COVID-19 in geographic regions where infection is likely to have been caused by a non-susceptible

---

[11] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.
[12] "Authorized Distributor(s)" are identified by Regeneron as an entity or entities allowed to distribute authorized REGEN-COV.
[13] Monoclonal antibodies, such as casirivimab and imdevimab, may be associated with worse clinical outcomes when administered to hospitalized patients with COVID-19 requiring high flow oxygen or mechanical ventilation.

Page 5 – Regeneron Pharmaceuticals, Inc.

SARS-CoV-2 variant, based on available information including variant susceptibility to this drug and regional variant frequency.[14]

- REGEN-COV may only be administered in settings in which health care providers have immediate access to medications to treat a severe infusion reaction, such as anaphylaxis, and the ability to activate the emergency medical system (EMS), as necessary.

- REGEN-COV is authorized for intravenous infusion. Subcutaneous injection is authorized as an alternative route of administration when intravenous infusion is not feasible and would lead to delay in treatment.

- The use of REGEN-COV covered by this authorization must be in accordance with the authorized Fact Sheets.

*Post-Exposure Prophylaxis*

- REGEN-COV may only be used in adult and pediatric individuals (12 years of age and older weighing at least 40 kg) for post-exposure prophylaxis of COVID-19 in individuals who are at high risk for progression to severe COVID-19, including hospitalization or death, and are:

  o not fully vaccinated[15] **or** who are not expected to mount an adequate immune response to complete SARS-CoV-2 vaccination (for example, individuals with immunocompromising conditions including those taking immunosuppressive medications[16]) **and**
    - have been exposed to an individual infected with SARS-CoV-2 consistent with close contact criteria per Centers for Disease Control and Prevention (CDC)[17] **or**
    - who are at high risk of exposure to an individual infected with SARS-CoV-2 because of occurrence of SARS-CoV-2 infection in other

---

[14] FDA will monitor conditions to determine whether use in a geographic region is consistent with this scope of authorization, referring to available information, including information on variant susceptibility (see, e.g., section 15 of authorized Fact Sheet for Healthcare Providers), and the CDC regional variant frequency data available at: https://covid.cdc.gov/covid-data-tracker/#variant-proportions. FDA's determination and any updates will be available at: https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#coviddrugs.

[15] Individuals are considered to be fully vaccinated 2 weeks after their second vaccine dose in a 2-dose series (such as the Pfizer or Moderna vaccines), or 2 weeks after a single-dose vaccine (such as the Johnson & Johnson/ Janssen vaccine). See this website for more details: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html#vaccinated.

[16] See this website for more details: https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html

[17] Close contact with an infected individual is defined as: being within 6 feet for a total of 15 minutes or more, providing care at home to someone who is sick, having direct physical contact with the person (hugging or kissing, for example), sharing eating or drinking utensils, or being exposed to respiratory droplets from an infected person (sneezing or coughing, for example). See this website for additional details: https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html

Page 6 – Regeneron Pharmaceuticals, Inc.

> individuals in the same institutional setting (for example, nursing homes, prisons).

- The monoclonal antibodies that comprise REGEN-COV, casirivimab and imdevimab, may only be administered together;

- REGEN-COV is **not** authorized for post-exposure prophylaxis of COVID-19 in geographic regions where exposure is likely to have been to a non-susceptible SARS-CoV-2 variant, based on available information including variant susceptibility to these drugs and regional variant frequency.[18]

- REGEN-COV may only be administered in settings in which health care providers have immediate access to medications to treat a severe infusion reaction, such as anaphylaxis, and the ability to activate the emergency medical system (EMS), as necessary.

- REGEN-COV is authorized for either intravenous infusion or subcutaneous injection when administered for post-exposure prophylaxis under this authorization.

- The use of REGEN-COV covered by this authorization must be in accordance with the authorized Fact Sheets.

- Post-exposure prophylaxis with REGEN-COV (casirivimab with imdevimab) is **not** intended to be a substitute for vaccination against COVID-19.

- REGEN-COV is **not** authorized for pre-exposure prophylaxis for prevention of COVID-19.

**Product Description**

Casirivimab and imdevimab are recombinant neutralizing human IgG1 monoclonal antibodies that target the receptor binding domain of the spike protein of SARS-CoV-2. REGEN-COV is available in three distinct presentations: (1) REGEN-COV co-packaged in an individual carton, (2) REGEN-COV in dose pack bags, and (3) co-formulated solution of REGEN-COV.[19]

---

[18] Supra at Note 14.

[19] Individual vials of casirivimab and imdevimab distributed in interstate commerce prior to the reissuance of this letter on February 3, 2021 remain authorized for emergency use. FDA is not requiring that such product be repackaged given the public health need for the product. The use of the individual vials of casirivimab and imdevimab must be consistent with the terms and conditions of this authorization. Individual vial labels for casirivimab and imdevimab and carton labeling may be clearly marked with either "Caution: New Drug - Limited by Federal (or United States) law to investigational use" or with "For use under Emergency Use Authorization (EUA)". Some vial labels and carton labeling of casirivimab and imdevimab may be instead labeled with the Investigational New Drug (IND) clinical trial code name as "REGN10933" and "REGN10987", respectively.

Page 7 – Regeneron Pharmaceuticals, Inc.

(1) *Co-packaged REGEN-COV:* Co-packaged REGEN-COV is comprised of one vial each of both casirivimab and imdevimab inside a single carton. Individual vial and carton container labeling for casirivimab and imdevimab covered in the authorized co-packaged presentation will be clearly marked with either "For pandemic use" or "For Use under Emergency Use Authorization."

Casirivimab is available as 300 mg/2.5 mL (120 mg/mL) or 1332 mg/11.1 mL (120 mg/mL) sterile, preservative-free aqueous solution to be diluted prior to infusion. Imdevimab is available as 300 mg/2.5 mL (120 mg/mL) or 1332 mg/11.1 mL (120 mg/mL) sterile, preservative-free aqueous solution to be diluted prior to infusion. Co-packaged REGEN-COV supplied in the 1332 mg/11.1 mL strength presentation will include a sufficient number of vials of casirivimab and imdevimab to prepare more than one dose.

The authorized storage and handling information for the co-packaged REGEN-COV is included in the authorized Fact Sheet for Healthcare Providers.

(2) *Dose pack bags:* Dose pack bags of REGEN-COV will include a sufficient number of vials of casirivimab and imdevimab to prepare more than one dose. Individual vials and carton container labeling for casirivimab and imdevimab included in dose pack bags are clearly marked "For Use under Emergency Use Authorization." Casirivimab and imdevimab are recombinant neutralizing human IgG1 monoclonal antibodies that target the receptor binding domain of the spike protein of SARS-CoV-2.

Casirivimab is available as 300 mg/2.5 mL (120 mg/mL) or 1332 mg/11.1 mL (120 mg/mL) sterile, preservative-free aqueous solution to be diluted prior to infusion. Imdevimab is available as 300 mg/2.5 mL (120 mg/mL) or 1332 mg/11.1 mL (120 mg/mL) sterile, preservative-free aqueous solution to be diluted prior to infusion.

The authorized storage and handling information for the dose pack bags of REGEN-COV is included in the authorized Fact Sheet for Healthcare Providers.

(3) *Co-formulated solution of REGEN-COV:* The co-formulated solution of REGEN-COV contains two antibodies in a 1:1 ratio in a single dose vial consisting of 600 mg casirivimab and 600 mg of imdevimab per 10 mL (60 mg/60 mg per mL). Individual vials of co-formulated REGEN-COV are clearly marked "For Use under Emergency Use Authorization."

Co-formulated casirivimab and imdevimab is a sterile, preservative-free, clear to slightly opalescent, colorless to pale yellow solution. Co-formulated REGEN-COV may be administered via intravenous infusion or subcutaneous injection.

The authorized storage and handling information for the co-formulated solution of REGEN-COV is included in the authorized Fact Sheet for Healthcare Providers.

Any presentation of REGEN-COV described above may be prepared for intravenous infusion or subcutaneous injection.[20]

---

[20] Certain carton labeling for the co-packaged presentation of REGEN-COV is labeled as "casirivimab and

Page 8 – Regeneron Pharmaceuticals, Inc.

REGEN-COV is authorized for emergency use with the following product-specific information required to be made available to healthcare providers and patients/caregivers, respectively, through Regeneron's website at www.REGENCOV.com:

- Fact Sheet for Health Care Providers: Emergency Use Authorization (EUA) of REGEN-COV (casirivimab and imdevimab)

- Fact Sheet for Patients, Parents and Caregivers: Emergency Use Authorization (EUA) of REGEN-COV (casirivimab and imdevimab) for Coronavirus Disease 2019 (COVID-19)

The co-packaged presentation of REGEN-COV that is labeled "For pandemic use" is also authorized for emergency use with the document entitled *Casirivimab and Imdevimab Co-Packaged Product Quick Reference Guide*, which must accompany this authorized co-packaged presentation of REGEN-COV in hardcopy format.

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of REGEN-COV, when used for treatment and as post-exposure prophylaxis of COVID-19 as described in this Scope of Authorization (Section II), outweigh the known and potential risks.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that REGEN-COV may be effective for treatment and as post-exposure prophylaxis of COVID-19 when used in accordance with this Scope of Authorization (Section II), pursuant to Section 564(c)(2)(A) of the Act.

Having reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I above, I have concluded that REGEN-COV (as described in this Scope of Authorization (Section II)) meets the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of your product under an EUA must be consistent with, and may not exceed, the terms of the Authorization, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section III). Subject to the terms of this EUA and under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), REGEN-COV is authorized for treatment and as post-exposure prophylaxis of COVID-19 as described in this Scope of Authorization (Section II) under this EUA, despite the fact that it does not meet certain requirements otherwise required by applicable federal law.

## III.    Conditions of Authorization

Pursuant to Section 564 of the Act, I am establishing the following conditions on this authorization:

---

imdevimab 120 mg/mL concentrate for solution for infusion. The vials in the carton for the co-packaged presentation of REGEN-COV may be used to prepare and administer REGEN-COV for either intravenous infusion or subcutaneous injection despite this labeling.

Page 9 – Regeneron Pharmaceuticals, Inc.

Regeneron and Authorized Distributors

A. Regeneron and authorized distributor(s) will ensure that the authorized REGEN-COV is distributed as directed by the U.S. government, and the authorized labeling (i.e., Fact Sheets) will be made available to healthcare facilities and/or healthcare providers consistent with the terms of this letter.

B. Regeneron and authorized distributor(s) will ensure that appropriate storage and cold chain is maintained until the product is delivered to healthcare facilities and/or healthcare providers.

C. Regeneron and authorized distributor(s) will ensure that the terms of this EUA are made available to all relevant stakeholders (e.g., U.S. government agencies, state and local government authorities, authorized distributors, healthcare facilities, healthcare providers) involved in distributing or receiving authorized REGEN-COV. Regeneron will provide to all relevant stakeholders a copy of this letter of authorization and communicate any subsequent amendments that might be made to this letter of authorization and its authorized accompanying materials (i.e., Fact Sheets).

D. Regeneron may request changes to this authorization, including to the authorized Fact Sheets for REGEN-COV. Any request for changes to this EUA must be submitted to the Office of Infectious Diseases/Office of New Drugs/Center for Drug Evaluation and Research. Such changes require appropriate authorization prior to implementation.[21]

E. Regeneron may develop and disseminate instructional and educational materials (e.g., materials providing information on product administration and/or patient monitoring) that are consistent with the authorized emergency use of REGEN-COV as described in this letter of authorization and authorized labeling, without FDA's review and concurrence, when necessary to meet public health needs. Any instructional and educational materials that are inconsistent with the authorized labeling for REGEN-COV are prohibited. Should the Agency become aware of any instructional or educational materials that are inconsistent with the authorized labeling for REGEN-COV, the Agency will require Regeneron to cease distribution of such instructional and educational materials.

---

[21] The following types of revisions may be authorized without reissuing this letter: (1) changes to the authorized labeling; (2) non-substantive editorial corrections to this letter; (3) new types of authorized labeling, including new fact sheets; (4) new carton/container labels; (5) expiration dating extensions; (6) changes to manufacturing processes, including tests or other authorized components of manufacturing; (7) new conditions of authorization to require data collection or study; (8) new strengths of the authorized product, new product sources (e.g., of active pharmaceutical ingredient) or of product components. For changes to the authorization, including the authorized labeling, of the type listed in (3), (6), (7), or (8), review and concurrence is required from the Counter-Terrorism and Emergency Coordination Staff/Office of the Center Director/CDER and the Office of Counterterrorism and Emerging Threats/Office of the Chief Scientist.

Page 10 – Regeneron Pharmaceuticals, Inc.

F.  Regeneron will report to FDA serious adverse events and all medication errors associated with the use of the authorized REGEN-COV that are reported to Regeneron using either of the following options.

Option 1: Submit reports through the Safety Reporting Portal (SRP) as described on the <u>FDA SRP</u> web page.

Option 2: Submit reports directly through the Electronic Submissions Gateway (ESG) as described on the <u>FAERS electronic submissions</u> web page.

Submitted reports under both options must state: "REGEN-COV use for COVID-19 under Emergency Use Authorization (EUA)." For reports submitted under Option 1, include this language at the beginning of the question "Describe Event" for further analysis. For reports submitted under Option 2, include this language at the beginning of the "Case Narrative" field.

G.  All manufacturing, packaging, and testing sites for both drug substance and drug product will comply with current good manufacturing practice requirements of Section 501(a)(2)(B) of the Act.

H.  Regeneron will submit information to the Agency within three working days of receipt of any information concerning significant quality problems with distributed drug product of REGEN-COV that includes the following:

- Information concerning any incident that causes the drug product or its labeling to be mistaken for, or applied to, another article; or
- Information concerning any microbiological contamination, or any significant chemical, physical, or other change or deterioration in the distributed drug product, or any failure of one or more distributed batches of the product to meet the established specifications.

If a significant quality problem affects unreleased product and may also impact product(s) previously released and distributed, then information must be submitted for all potentially impacted lots.

Regeneron will include in its notification to the Agency whether the batch, or batches, in question will be recalled. If FDA requests that these, or any other batches, at any time, be recalled, Regeneron must recall them.

If not included in its initial notification, Regeneron must submit information confirming that Regeneron has identified the root cause of the significant quality problems and taken corrective action, and provide a justification confirming that the corrective action is appropriate. Regeneron must submit this information as soon as possible but no later than 45 calendar days from the initial notification.

I.  Regeneron will manufacture REGEN-COV to meet all quality standards and per the manufacturing process and control strategy as detailed in Regeneron's EUA request.

Page 11 – Regeneron Pharmaceuticals, Inc.

Regeneron will not implement any changes to the description of the product, manufacturing process, facilities and equipment, and elements of the associated control strategy that assure process performance and quality of the authorized product, without notification to and concurrence by the Agency as described under condition D.

J. Regeneron will list the single dose pack bag, the co-packaged product, and the co-formulated product containing casirivimab and imdevimab with unique NDC product codes from each other and the NDC product codes of the single ingredient listings under the marketing category of Unapproved Drug-Other. As applicable, different vial sizes should be identified by a different package NDC within the product NDC. Further, the listing will include each establishment where manufacturing is performed for the drug and the type of operation performed at such establishment.

K. Through a process of inventory control, Regeneron and authorized distributor(s) will maintain records regarding distribution of the authorized casirivimab and imdevimab (i.e., lot numbers, quantity, receiving site, receipt date).

L. Regeneron and authorized distributor(s) will make available to FDA upon request any records maintained in connection with this EUA.

M. Regeneron will establish a process for monitoring genomic database(s) for the emergence of global viral variants of SARS-CoV-2. A summary of Regeneron's process should be submitted to the Agency as soon as practicable, but no later than 30 calendar days of the issuance of this letter, and within 30 calendar days of any material changes to such process. Regeneron will provide reports to the Agency on a monthly basis summarizing any findings as a result of its monitoring activities and, as needed, any follow-up assessments planned or conducted.

N. FDA may require Regeneron to assess the activity of the authorized REGEN-COV against any global SARS-CoV-2 variant(s) of interest (e.g., variants that are prevalent or becoming prevalent that harbor substitutions in the target protein or in protein(s) that interact with the target protein). Regeneron will perform the required assessment in a manner and timeframe agreed upon by Regeneron and the Agency. Regeneron will submit to FDA a preliminary summary report immediately upon completion of its assessment followed by a detailed study report within 30 calendar days of study completion. Regeneron will submit any relevant proposal(s) to revise the authorized labeling based on the results of its assessment, as may be necessary or appropriate based on the foregoing assessment.

O. Regeneron shall provide samples as requested of the authorized REGEN-COV to the U.S. Department of Health and Human Services (HHS) for evaluation of activity against emerging global viral variants of SARS-CoV-2, including specific amino acid substitution(s) of interest (e.g., variants that are highly prevalent or that harbor substitutions in the target protein) within 5 business days of any request made by HHS. Analyses performed with the supplied quantity of authorized REGEN-COV may include, but are not limited to, cell culture potency assays, protein binding assays, cell culture variant assays (pseudotyped virus-like particles and/or authentic virus), and *in vivo* efficacy assays.

Page 12 – Regeneron Pharmaceuticals, Inc.

    P.  Regeneron will submit to FDA all sequencing data assessing REGEN-COV, including sequencing of any participant samples from the full analysis population from COV-2067 that have not yet been completed no later than July 30, 2021. Regeneron will provide the Agency with a frequency table reporting all substitutions detected for all participants at all available time points at a frequency ≥5%.

    Q.  Regeneron will submit to FDA all SARS-CoV-2 nasopharyngeal viral shedding and blood viral load data, including quantitation of viral load for any participant samples from the full analysis population for which REGEN-COV is currently authorized from COV-2067 that have not yet been completed, no later than July 30, 2021.

<u>Healthcare Facilities to Whom the Authorized REGEN-COV Is Distributed and Healthcare Providers Administering the Authorized Casirivimab and Imdevimab</u>

    R.  Healthcare facilities and healthcare providers will ensure that they are aware of the letter of authorization, and the terms herein, and that the authorized Fact Sheets are made available to healthcare providers and to patients and caregivers, respectively, through appropriate means, prior to administration of REGEN-COV.

    S.  Healthcare facilities and healthcare providers receiving REGEN-COV will track serious adverse events and medication errors that are considered to be potentially attributable to REGEN-COV use and must report these to FDA in accordance with the Fact Sheet for Healthcare Providers. Complete and submit a MedWatch form (www.fda.gov/medwatch/report.htm), or Complete and submit FDA Form 3500 (health professional) by fax (1-800-FDA-0178) (these forms can be found via link above). Call 1-800-FDA-1088 for questions. Submitted reports must state, "REGEN-COV use for COVID-19 under Emergency Use Authorization" at the beginning of the question "Describe Event" for further analysis.

    T.  Healthcare facilities and healthcare providers will ensure that appropriate storage and cold chain is maintained until the product is administered consistent with the terms of this letter.

    U.  Through a process of inventory control, healthcare facilities will maintain records regarding the dispensed authorized REGEN-COV (i.e., lot numbers, quantity, receiving site, receipt date), product storage, and maintain patient information (e.g., patient name, age, disease manifestation, number of doses administered per patient, other drugs administered).

    V.  Healthcare facilities will ensure that any records associated with this EUA are maintained until notified by Regeneron and/or FDA. Such records will be made available to Regeneron, HHS, and FDA for inspection upon request.

    W.  Healthcare facilities and providers will report therapeutics information and utilization data as directed by the U.S. Department of Health and Human Services.

Page 13 – Regeneron Pharmaceuticals, Inc.

<u>Conditions Related to Printed Matter, Advertising and Promotion</u>

X. All descriptive printed matter, advertising, and promotional materials relating to the use of the REGEN-COV under this authorization shall be consistent with the authorized labeling, as well as the terms set forth in this EUA, and meet the requirements set forth in section 502(a) and (n) of the Act and FDA implementing regulations, as applicable. References to "approved labeling", "permitted labeling" or similar terms in these requirements shall be understood to refer to the authorized labeling for the use of REGEN-COV under this authorization. In addition, such materials shall:

- Be tailored to the intended audience.
- Not take the form of reminder advertisements, as that term is described in 21 CFR 202.1(e)(2)(i), 21 CFR 200.200 and 21 CFR 201.100(f).
- Present the same risk information relating to the major side effects and contraindications concurrently in the audio and visual parts of the presentation for advertising and promotional materials in audio-visual format.
- Be accompanied by the authorized labeling, if the promotional materials are not subject to Section 502(n) of the Act.
- Be submitted to FDA accompanied by Form FDA-2253 at the time of initial dissemination or first use.

If the Agency notifies Regeneron that any descriptive printed matter, advertising or promotional materials do not meet the terms set forth in conditions X-Z of this EUA, Regeneron must cease distribution of such descriptive printed matter, advertising, or promotional materials in accordance with the Agency's notification. Furthermore, as part of its notification, the Agency may also require Regeneron to issue corrective communication(s).

Y. No descriptive printed matter, advertising, or promotional materials relating to the use of REGEN-COV under this authorization may represent or suggest that REGEN-COV is safe or effective when used for the treatment of COVID-19 or when used as post-exposure prophylaxis as described in the Scope of Authorization (Section II).

Z. All descriptive printed matter, advertising, and promotional material, relating to the use of the REGEN-COV under this authorization shall clearly and conspicuously state that:

- REGEN-COV has not been approved, but has been authorized for emergency use by FDA under an EUA, for treatment and as post-exposure prophylaxis of COVID-19 in certain adults and pediatric individuals (12 years of age and older weighing at least 40 kg) with high risk for progression to severe COVID-19, including hospitalization or death, and

- The emergency use of REGEN-COV is only authorized for the duration of the declaration that circumstances exist justifying the authorization of the emergency use of drugs and biological products during the COVID-19

Page 14 – Regeneron Pharmaceuticals, Inc.

pandemic under Section 564(b)(1) of the Act, 21 U.S.C. § 360bbb-3(b)(1), unless the declaration is terminated or authorization revoked sooner.

**IV.     Duration of Authorization**

This EUA will be effective until the declaration that circumstances exist justifying the authorization of the emergency use of drugs and biological products during the COVID-19 pandemic is terminated under Section 564(b)(2) of the Act or the EUA is revoked under Section 564(g) of the Act.

Sincerely,

--/S/--

_____
Jacqueline A. O'Shaughnessy, Ph.D.
Acting Chief Scientist
Food and Drug Administration



January 24, 2022

Eli Lilly and Company
Attention: Christine Phillips, PhD, RAC
Advisor Global Regulatory Affairs - US
Lilly Corporate Center
Drop Code 2543
Indianapolis, IN 46285

RE:     Emergency Use Authorization 094

Dear Ms. Phillips:

On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Act, the Secretary of the
Department of Health and Human Services (HHS) determined that there is a public health
emergency that has a significant potential to affect national security or the health and security of
United States citizens living abroad, and that involves the virus that causes coronavirus disease
2019 (COVID-19).[1]  On the basis of such determination, the Secretary of HHS on March 27,
2020, declared that circumstances exist justifying the authorization of emergency use of drugs
and biological products during the COVID-19 pandemic, pursuant to Section 564 of the Federal
Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 360bbb-3), subject to terms of any
authorization issued under that section.[2]

On February 9, 2021, the Food and Drug Administration (FDA or Agency) issued an Emergency
Use Authorization (EUA) for emergency use of bamlanivimab and etesevimab administered
together for the treatment of mild to moderate COVID-19 in adults and pediatric patients (12
years of age and older weighing at least 40 kg) with positive results of direct SARS-CoV-2 viral
testing, and who are at high risk for progressing to severe COVID-19 and/or hospitalization.
Bamlanivimab and etesevimab are neutralizing IgG1 monoclonal antibodies that bind to distinct
but overlapping epitopes within the receptor binding domain of the spike protein of SARS-CoV-
2. They are both investigational drugs and are not currently approved for any indication.

---

[1] U.S. Department of Health and Human Services, *Determination of a Public Health Emergency and Declaration
that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and
Cosmetic Act, 21 U.S.C. § 360bbb-3.* February 4, 2020.
[2] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations
Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3,* 85 FR 18250
(April 1, 2020).

Page 2 – Eli Lilly and Company

FDA subsequently reissued the Letter of Authorization on the following dates: February 25, 2021,[3] August 27, 2021,[4] September 16, 2021,[5] December 3, 2021,[6] and December 22, 2021.[7]

On January 24, 2022, again having concluded that revising this EUA is appropriate to protect the public health or safety under section 564(g)(2) of the Act, FDA is reissuing the December 22, 2021 letter in its entirety, to further limit the use of bamlanivimab and etesevimab administered together for treatment of COVID-19 or as post-exposure prophylaxis of COVID-19 to exclude geographic regions where, based on available information including variant susceptibility to these drugs and regional variant frequency, infection or exposure is likely due to a variant that is non-susceptible to bamlanivimab and etesevimab. Corresponding revisions have also been made to the authorized Fact Sheets.

To support the emergency use of bamlanivimab and etesevimab, which were originally authorized to be administered together for the treatment of mild-to-moderate COVID-19 in certain adults and pediatric patients (12 years of age and older weighing at least 40 kg), FDA reviewed data from the Phase 2/3 BLAZE-1 trial (NCT04427501), a randomized, double-blind, placebo-controlled clinical trial, and the Phase 2 BLAZE-4 trial (NCT04634409), a randomized, double-blind, placebo-controlled clinical trial. Expansion of this authorization to also include younger pediatric patients, including neonates, is supported by FDA's review of pharmacokinetic and clinical data from the Phase 3 portion of the BLAZE-1 trial (NCT04427501), clinical data from the BLAZE-1 (NCT04427501) and BLAZE-4 (NCT04497987) clinical trials, and the Agency's understanding of the similar course of COVID-19 disease across the authorized patient populations. Based on the totality of scientific evidence available, including these data, it is reasonable to believe that bamlanivimab and etesevimab administered together may be effective for the treatment of mild to moderate COVID-19 in adults and pediatric patients, including neonates, with positive results of direct SARS-CoV-2 viral testing, and who are at high risk for

[3] In its February 25, 2021 revision, FDA revised the condition on instructional and educational materials. New conditions were also incorporated on the establishment of a process for monitoring genomic databases for the emergence of global viral variants of SARS-CoV-2 and the assessment, if requested by FDA, of the activity of the authorized bamlanivimab and etesevimab against any global SARS-CoV-2 variant(s) of interest.

[4] In its August 27, 2021 revision, FDA revised the authorized use for bamlanivimab and etesevimab administered together clarifying the meaning of "severe COVID-19" and further limited the use of bamlanivimab and etesevimab by authorizing bamlanivimab and etesevimab administered together only in those states, territories, and US jurisdictions in which the combined frequency of variants resistant to bamlanivimab and etesevimab administered together is less than or equal to 5%. Revisions were also incorporated to the conditions on compliance with cGMPs, product quality reporting, requests for CMC (chemistry, manufacturing and controls) changes to this authorization, the provision of samples of the authorized bamlanivimab and etesevimab to HHS, upon request, and the conditions on advertising and promotion.

[5] In its September 16, 2021 revision, FDA reissued the EUA to authorize bamlanivimab and etesevimab administered together for emergency use as post-exposure prophylaxis for COVID-19 in certain adults and pediatric individuals (12 years of age and older weighing at least 40 kg).

[6] In its December 3, 2021 revision, FDA reissued the EUA to also authorize bamlanivimab and etesevimab administered together for emergency use as treatment for COVID-19 and as post-exposure prophylaxis of COVID-19 in certain younger pediatric individuals, including neonates, not covered under prior authorizations.

[7] In its December 22, 2021 revision, FDA removed the limitation on the authorized use of bamlanivimab and etesevimab that previously authorized bamlanivimab and etesevimab administered together only in those states, territories, and U.S. jurisdictions in which the combined frequency of variants resistant to bamlanivimab and etesevimab administered together is less than or equal to 5%. FDA also revised the Fact Sheet for Healthcare Providers to remove this limitation on the authorized use of bamlanivimab and etesevimab and to incorporate additional virology information.

Page 3 – Eli Lilly and Company

progression to severe COVID-19, including hospitalization or death, and that, when used under the conditions described in this authorization, the known and potential benefits of bamlanivimab and etesevimab administered together outweigh the known and potential risks of such products.

Additionally, to support the emergency use of bamlanivimab and etesevimab, which were originally authorized to be administered together for post-exposure prophylaxis of COVID-19 in certain adults and pediatric individuals (12 years of age and older weighing at least 40 kg), FDA reviewed the topline analysis of data from BLAZE-2 Part 1 (also known as Trial J2X-MC-PYAD; NCT04497987), a Phase 3 randomized, double-blind, placebo-controlled trial evaluating bamlanivimab alone for prevention of COVID-19 in residents and staff of skilled nursing facilities following a confirmed reported case of SARS-CoV-2 infection at the facility. Expansion of this authorization to also include younger pediatric patients, including neonates, is supported by the Agency's review of pharmacokinetic data and its understanding of the mechanism of action for bamlanivimab and etesevimab administered together and the expectation that bamlanivimab and etesevimab administered together will provide a similar clinical benefit in younger pediatric patients, including neonates, as compared to adults. Based on the totality of scientific evidence available, including these data, it is reasonable to believe that bamlanivimab and etesevimab administered together may be effective for use as post-exposure prophylaxis of COVID-19 in adults and pediatric individuals, including neonates, who are at high risk for progression to severe COVID-19, including hospitalization or death, as described in the Scope of Authorization (Section II), and that, when used under such conditions, the known and potential benefits of bamlanivimab and etesevimab outweigh the known and potential risks of such product.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of bamlanivimab and etesevimab administered together for treatment and as post-exposure prophylaxis of COVID-19, as described in the Scope of Authorization section of this letter (Section II) and subject to the terms of this authorization.

## I.    Criteria for Issuance of Authorization

I have concluded that the emergency use of bamlanivimab and etesevimab administered together for treatment and as post-exposure prophylaxis of COVID-19 when administered as described in the Scope of Authorization (Section II) meets the criteria for issuance of an authorization under Section 564(c) of the Act, because:

1. SARS-CoV-2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

2. Based on the totality of scientific evidence available to FDA, it is reasonable to believe the following:

   • Bamlanivimab and etesevimab administered together may be effective for the treatment of mild to moderate COVID-19 in adults and pediatric patients, including neonates, with positive results of direct SARS-CoV-2 viral testing, and who are at high risk for progression to severe COVID-19, including

Page 4 – Eli Lilly and Company

   hospitalization or death, as further described in the Scope of Authorization (Section II)

  • Bamlanivimab and etesevimab administered together may be effective for use as post-exposure prophylaxis in certain adults and pediatric individuals, including neonates, who are at high risk for progression to severe COVID-19, including hospitalization or death, as further described in the Scope of Authorization (Section II)

  And that, when used under the conditions described in the Scope of Authorization (Section II), the known and potential benefits of bamlanivimab and etesevimab administered together outweigh the known and potential risks of such products; and

3. There is no adequate, approved, and available alternative to the emergency use of bamlanivimab and etesevimab administered together for treatment and as post-exposure prophylaxis of COVID-19, as described in the Scope of Authorization (Section II).[8]

## II.   Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited as follows:

  • Distribution of the authorized bamlanivimab and etesevimab will be controlled by the United States (U.S.) Government for use consistent with the terms and conditions of this EUA. Lilly will supply bamlanivimab and etesevimab to authorized distributors[9], who will distribute to healthcare facilities or healthcare providers as directed by the U.S. Government, in collaboration with state and local government authorities as needed;

*Treatment of COVID-19*

  • Bamlanivimab and etesevimab covered by this authorization will be administered together only by healthcare providers to treat mild to moderate COVID-19 in adults and pediatric patients, including neonates, with positive results of direct SARS-CoV-2 viral testing, and who are at high risk for progression to severe COVID-19, including hospitalization or death;

  • Bamlanivimab and etesevimab may only be administered together;

---

[8] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.
[9] "Authorized Distributor(s)" are identified by Lilly as an entity or entities allowed to distribute authorized bamlanivimab and etesevimab to be administered together.

Page 5 – Eli Lilly and Company

- Bamlanivimab and etesevimab are **not** authorized for use in patients 2 years of age and older who are hospitalized due to COVID-19[10];

- Bamlanivimab and etesevimab are **not** authorized for use in patients, regardless of age, who:
  - o require oxygen therapy and/or respiratory support due to COVID-19; or
  - o require an increase in baseline oxygen flow rate and/or respiratory support due to COVID-19 and are on chronic oxygen therapy and/or respiratory support due to underlying non-COVID-19 related comorbidity.

- Bamlanivimab and etesevimab are **not** authorized for treatment of mild to moderate COVID-19 in geographic regions where infection is likely to have been caused by a non-susceptible SARS-CoV-2 variant, based on available information including variant susceptibility to these drugs and regional variant frequency.[11]

- Bamlanivimab and etesevimab may only be administered together in settings in which health care providers have immediate access to medications to treat a severe infusion reaction, such as anaphylaxis, and the ability to activate the emergency medical system (EMS), as necessary;

- The use of bamlanivimab and etesevimab covered by this authorization must be in accordance with the authorized Fact Sheets.

*Post-Exposure Prophylaxis of COVID-19*

- Bamlanivimab and etesevimab administered together may only be used in adult and pediatric individuals, including neonates, for post-exposure prophylaxis of COVID-19 in individuals who are at high risk for progression to severe COVID-19, including hospitalization or death, and are:
  - o not fully vaccinated[12] **or** who are not expected to mount an adequate immune

---

[10] Treatment with bamlanivimab and etesevimab has not been studied in patients hospitalized due to COVID-19. Monoclonal antibodies, such as bamlanivimab and etesevimab, may be associated with worse clinical outcomes when administered to hospitalized patients with COVID-19 requiring high flow oxygen or mechanical ventilation. However, the reasons for hospital admission may be different and the threshold for hospital admission may be lower for neonates, young infants and toddlers with COVID-19 compared to older children and adults. This authorization covers young children (i.e., birth to 2 years of age) who are hospitalized with mild to moderate COVID-19 at the time of treatment to receive bamlanivimab and etesevimab.

[11] FDA will monitor conditions to determine whether use in a geographic region is consistent with this scope of authorization, referring to available information, including information on variant susceptibility (see, e.g., section 15 of authorized Fact Sheet for Health Care Providers), and CDC regional variant frequency data available at: https://covid.cdc.gov/covid-data-tracker/#variant-proportions.. FDA's determination and any updates will be available at: https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#coviddrugs..

[12] Individuals are considered to be fully vaccinated 2 weeks after their second vaccine dose in a 2-dose series (such as the Pfizer or Moderna vaccines), or 2 weeks after a single-dose vaccine (such as the Johnson & Johnson/ Janssen vaccine). See this website for more details: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html#vaccinated.

Page 6 – Eli Lilly and Company

response to complete SARS-CoV-2 vaccination (for example, individuals with immunocompromising conditions including those taking immunosuppressive medications[13]) **and**
- have been exposed to an individual infected with SARS-CoV-2 consistent with close contact criteria per Centers for Disease Control and Prevention (CDC)[14] **or**
- who are at high risk of exposure to an individual infected with SARS-CoV-2 because of occurrence of SARS-CoV-2 infection in other individuals in the same institutional setting (for example, nursing homes, prisons).

- Bamlanivimab and etesevimab may only be administered together;

- Bamlanivimab and etesevimab are **not** authorized for post-exposure prophylaxis of COVID-19 in geographic regions where exposure is likely to have been to a non-susceptible SARS-CoV-2 variant, based on available information including variant susceptibility to these drugs, and regional variant frequency.[15]

- Bamlanivimab and etesevimab may only be administered in settings in which health care providers have immediate access to medications to treat a severe infusion reaction, such as anaphylaxis, and the ability to activate EMS, as necessary.

- The use of bamlanivimab and etesevimab covered by this authorization must be in accordance with the authorized Fact Sheets.

- Post-exposure prophylaxis with bamlanivimab and etesevimab administered together is **not** intended to be a substitute for vaccination against COVID-19.

- Bamlanivimab and etesevimab administered together is **not** authorized for pre-exposure prophylaxis for prevention of COVID-19.

**Product Description**

Bamlanivimab and etesevimab are neutralizing IgG1 monoclonal antibodies that bind to distinct but overlapping epitopes within the receptor binding domain of the spike protein of SARS-CoV-2. Bamlanivimab injection, 700 mg/20 mL, and etesevimab, 700 mg/20 mL, are sterile, preservative-free clear to opalescent and colorless to slightly yellow to slightly brown solutions to be diluted prior to infusion. One vial of bamlanivimab (20 mL) and two vials of etesevimab

---

[13] See this website for more details:  https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html
[14] Close contact with an infected individual is defined as: being within 6 feet for a total of 15 minutes or more, providing care at home to someone who is sick, having direct physical contact with the person (hugging or kissing, for example), sharing eating or drinking utensils, or being exposed to respiratory droplets from an infected person (sneezing or coughing, for example). See this website for additional details: https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html
[15] Supra at Note 11.

Page 7 – Eli Lilly and Company

(40 mL) are to be added to a prefilled 0.9% sodium chloride infusion bag as described in the healthcare provider fact sheet. The authorized bamlanivimab includes a vial label and/or carton labeling that is clearly marked "For use under Emergency Use Authorization (EUA)". The authorized etesevimab includes a vial label and/or carton labeling that is clearly marked "For use under Emergency Use Authorization (EUA)" and "MUST ADMINISTER WITH BAMLANIVIMAB."

The authorized storage and handling information for bamlanivimab and etesevimab is included in the authorized Fact Sheet for Healthcare Providers.

Bamlanivimab and etesevimab are authorized for emergency use as described in the Scope of Authorization (Section II) with the following product-specific information required to be made available to healthcare providers and patients, parents, and caregivers, respectively, through Lilly's website at www.LillyAntibody.com:

- Fact Sheet for Health Care Providers: Emergency Use Authorization (EUA) of Bamlanivimab and Etesevimab

- Fact Sheet for Patients, Parents and Caregivers: Emergency Use Authorization (EUA) of Bamlanivimab and Etesevimab for Coronavirus Disease 2019 (COVID-19)

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of bamlanivimab and etesevimab administered together, when used for treatment and as post-exposure prophylaxis of COVID-19 as described in this Scope of Authorization (Section II), outweigh its known and potential risks.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that bamlanivimab and etesevimab administered together may be effective for treatment and as post-exposure prophylaxis of COVID-19 when used in accordance with this Scope of Authorization (Section II), pursuant to Section 564(c)(2)(A) of the Act.

Having reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I above, I have concluded that bamlanivimab and etesevimab (as described in this Scope of Authorization (Section II)) meets the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of your product under an EUA must be consistent with, and may not exceed, the terms of the Authorization, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section III). Subject to the terms of this EUA and under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), bamlanivimab and etesevimab administered together are authorized for treatment and as post-exposure prophylaxis of COVID-19 as described in this Scope of Authorization (Section II) under this EUA, despite the fact that it does not meet certain requirements otherwise required by applicable federal law.

Page 8 – Eli Lilly and Company

## III.   Conditions of Authorization

Pursuant to Section 564 of the Act, I am establishing the following conditions on this authorization:

Eli Lilly and Company (Lilly) and Authorized Distributors

    A. Lilly and authorized distributor(s) will ensure that the authorized bamlanivimab and etesevimab are distributed, as directed by the U.S. government, and the authorized labeling (i.e., Fact Sheets) will be made available to healthcare facilities and/or healthcare providers consistent with the terms of this letter.

    B. Lilly and authorized distributor(s) will ensure that appropriate storage and cold chain is maintained until the product is delivered to healthcare facilities and/or healthcare providers.

    C. Lilly and authorized distributor(s) will ensure that the terms of this EUA are made available to all relevant stakeholders (e.g., U.S. government agencies, state and local government authorities, authorized distributors, healthcare facilities, healthcare providers) involved in distributing or receiving authorized bamlanivimab and etesevimab. Lilly will provide to all relevant stakeholders a copy of this Letter of Authorization and communicate any subsequent amendments that might be made to this Letter of Authorization and its authorized accompanying materials (i.e., Fact Sheets).

    D. Lilly may request changes to this authorization, including to the authorized Fact Sheets for bamlanivimab and etesevimab. Any request for changes to this EUA must be submitted to the Office of Infectious Diseases/Office of New Drugs/Center for Drug Evaluation and Research. Such changes require appropriate authorization prior to implementation.[16]

    E. Lilly may develop and disseminate instructional and educational materials (e.g., materials providing information on product administration and/or patient monitoring) that are consistent with the authorized emergency use of bamlanivimab and etesevimab as described in this Letter of Authorization and authorized labeling, without FDA's review and concurrence, when necessary to meet public health needs. Any instructional and educational materials that are inconsistent with the authorized labeling of bamlanivimab and etesevimab are prohibited. Should the Agency become aware of any instructional or educational materials that are inconsistent with the authorized labeling of bamlanivimab and etesevimab, the Agency will require Lilly to cease distribution of such instructional or educational materials.

---

[16] The following types of revisions may be authorized without reissuing this letter: (1) changes to the authorized labeling; (2) non-substantive editorial corrections to this letter; (3) new types of authorized labeling, including new fact sheets; (4) new carton/container labels; (5) expiration dating extensions; (6) changes to manufacturing processes, including tests or other authorized components of manufacturing; (7) new conditions of authorization to require data collection or study; (8) new strengths of the authorized product, new product sources (e.g., of active pharmaceutical ingredient) or of product components. For changes to the authorization, including the authorized labeling, of the type listed in (3), (6), (7), or (8), review and concurrence is required from the Counter-Terrorism and Emergency Coordination Staff/Office of the Center Director/CDER and the Office of Counterterrorism and Emerging Threats/Office of the Chief Scientist.

Page 9 – Eli Lilly and Company

F.  Lilly will report to FDA serious adverse events and all medication errors associated with the use of the authorized bamlanivimab and etesevimab that are reported to Lilly using either of the following options.

Option 1: Submit reports through the Safety Reporting Portal (SRP) as described on the FDA SRP web page.

Option 2: Submit reports directly through the Electronic Submissions Gateway (ESG) as described on the FAERS electronic submissions web page.

Submitted reports under both options must state: "bamlanivimab and etesevimab use for COVID-19 under Emergency Use Authorization (EUA)." For reports submitted under Option 1, include this language at the beginning of the question "Describe Event" for further analysis. For reports submitted under Option 2, include this language at the beginning of the "Case Narrative" field.

G.  All manufacturing, packaging, and testing sites for both drug substance and drug product will comply with current good manufacturing practice requirements of Section 501(a)(2)(B) of the Act.

H.  Lilly will retain an independent third party (i.e., not affiliated with Lilly) to conduct a review of the batch records and any underlying data and associated discrepancies of bamlanivimab drug substance manufactured at Lilly Branchburg, NJ.

- For all batches manufactured prior to the effective date of this authorization, these batches can be released while review is ongoing.
- For all batches manufactured after the effective date of this authorization, the third party review can be performed concurrent to Lilly's batch release process.

If the independent review finds, prior to release, a discrepancy with significant potential to affect critical quality attributes, the product must not be released unless and until the issue is satisfactorily resolved. Any discrepancies found by the independent review, whether prior to or after release, must be reported to the Agency in a summary report, submitted every 14 calendar days, and include Lilly's corrective and preventive action plans for each discrepancy, including whether market action is required. The plans must include an appropriate evaluation of each discrepancy's potential impact on any released drug substance and associated drug product.

I.  Lilly will retain an independent third-party (i.e., not affiliated with Lilly) to conduct laboratory release testing of bamlanivimab drug substance manufactured at Lilly, Branchburg (excluding bioburden and endotoxin testing). Any discrepancies found by the independent laboratory must be reported to the Agency in a summary report, submitted every 14 calendar days, and include Lilly's corrective and preventive action plans for each discrepancy. The plans must include an appropriate evaluation of each discrepancy's potential impact on any released drug substance and associated drug product.

Page 10 – Eli Lilly and Company

J. Lilly will submit information to the Agency within three working days of receipt of any information concerning significant quality problems with batches (whether distributed or undistributed) of drug product of bamlanivimab and etesevimab that includes the following:

- Information concerning any incident that causes the drug product or its labeling to be mistaken for, or applied to, another article; or

- Information concerning any microbiological contamination, or any significant chemical, physical, or other change or deterioration in the distributed drug product, or any failure of one or more distributed batches of the product to meet the established specifications.

If a significant quality problem affects unreleased product and may also impact product(s) previously released and distributed, then information must be submitted for all potentially impacted lots.

Lilly will include in its notification to the Agency whether the batch, or batches, in question will be recalled. If FDA requests that these, or any other batches, at any time, be recalled, Lilly must recall them.

If not included in its initial notification, Lilly must submit information confirming that Lilly has identified the root cause of the significant quality problems and taken corrective action, and provide a justification confirming that the corrective action is appropriate. Lilly must submit this information as soon as possible but no later than 45 calendar days from the initial notification.

K. Lilly will manufacture bamlanivimab and etesevimab to meet all quality standards and per the manufacturing process and control strategy as detailed in Lilly's EUA request. Lilly will not implement any changes to the description of the product, manufacturing process, facilities and equipment, and elements of the associated control strategy that assure process performance and quality of the authorized product, without notification to and concurrence by the Agency as described under condition D.

L. Lilly will individually list bamlanivimab and etesevimab with a unique product NDC under the marketing category of Unapproved Drug- Other. Further, each listing will include each establishment where manufacturing is performed for the drug and the type of operation performed at each such establishment.

M. Through a process of inventory control, Lilly and authorized distributor(s) will maintain records regarding distribution of the authorized bamlanivimab and etesevimab (i.e., lot numbers, quantity, receiving site, receipt date).

N. Lilly and authorized distributor(s) will make available to FDA upon request any records maintained in connection with this EUA.

Page 11 – Eli Lilly and Company

O.  Lilly will establish a process for monitoring genomic database(s) for the emergence of global viral variants of SARS-CoV-2. A summary of Lilly's process should be submitted to the Agency as soon as practicable, but no later than 30 calendar days of the issuance of this letter, and within 30 calendar days of any material changes to such process. Lilly will provide reports to the Agency on a monthly basis summarizing any findings as a result of its monitoring activities and, as needed, any follow-up assessments planned or conducted.

P.  FDA may require Lilly to assess the activity of the authorized bamlanivimab and etesevimab against any global SARS-CoV-2 variant(s) of interest (e.g., variants that are prevalent or becoming prevalent that harbor substitutions in the target protein or in protein(s) that interact with the target protein). Lilly will perform the required assessment in a manner and timeframe agreed upon by Lilly and the Agency. Lilly will submit to FDA a preliminary summary report immediately upon completion of its assessment followed by a detailed study report within 30 calendar days of study completion. Lilly will submit any relevant proposal(s) to revise the authorized labeling based on the results of its assessment, as may be necessary or appropriate based on the foregoing assessment.

Q.  Lilly shall provide samples as requested of the authorized bamlanivimab and etesevimab to the HHS for evaluation of activity against emerging global viral variants of SARS-CoV-2, including specific amino acid substitution(s) of interest (e.g., variants that are highly prevalent or that harbor substitutions in the target protein) within 5 business days of any request made by HHS. Analyses performed with the supplied quantity of authorized bamlanivimab and etesevimab may include, but are not limited to, cell culture potency assays, protein binding assays, cell culture variant assays (pseudotyped virus-like particles and/or authentic virus), and *in vivo* efficacy assays.

<u>Healthcare Facilities to Whom the Authorized Bamlanivimab and Etesevimab Are Distributed and Healthcare Providers Administering the Authorized Bamlanivimab and Etesevimab</u>

R.  Healthcare facilities and healthcare providers will ensure that they are aware of the letter of authorization, and the terms herein, and that the authorized Fact Sheets are made available to healthcare providers and to patients and caregivers, respectively, through appropriate means, prior to administration of bamlanivimab and etesevimab as described in the Scope of Authorization (Section II) under this EUA.

S.  Healthcare facilities and healthcare providers receiving bamlanivimab and etesevimab will track serious adverse events and all medication errors that are considered to be potentially attributable to the use of bamlanivimab and etesevimab under this authorization and must report these to FDA in accordance with the Fact Sheet for Healthcare Providers. Complete and submit a MedWatch form (www.fda.gov/medwatch/report.htm), or complete and submit FDA Form 3500 (health professional) by fax (1-800-FDA-0178) (these forms can be found via link above). Call 1-800-FDA-1088 for questions. Submitted reports must state, "bamlanivimab and etesevimab use for COVID-19 under Emergency Use Authorization (EUA)" at the beginning of the question "Describe Event" for further analysis.

Page 12 – Eli Lilly and Company

   T.  Healthcare facilities and healthcare providers will ensure that appropriate storage and cold chain is maintained until the products are administered consistent with the terms of this letter.

   U.  Through a process of inventory control, healthcare facilities will maintain records regarding the dispensed authorized bamlanivimab and etesevimab (i.e., lot numbers, quantity, receiving site, receipt date), product storage, and maintain patient information (e.g., patient name, age, disease manifestation, number of doses administered per patient, other drugs administered).

   V.  Healthcare facilities will ensure that any records associated with this EUA are maintained until notified by Lilly and/or FDA. Such records will be made available to Lilly, HHS, and FDA for inspection upon request.

   W.  Healthcare facilities and providers will report therapeutics information and utilization data as directed by HHS.

<u>Conditions Related to Printed Matter, Advertising and Promotion</u>

   X.  All descriptive printed matter, advertising, and promotional materials relating to the use of bamlanivimab and etesevimab under this authorization shall be consistent with the authorized labeling, as well as the terms set forth in this EUA, and meet the requirements set forth in Section 502(a) and (n) of the Act, as applicable, and FDA implementing regulations. References to "approved labeling", "permitted labeling" or similar terms in these requirements shall be understood to refer to the authorized labeling for the use of bamlanivimab and etesevimab under this authorization. In addition, such materials shall:

- Be tailored to the intended audience.
- Not take the form of reminder advertisements, as that term is described in 21 CFR 202.1(e)(2)(i), 21 CFR 200.200 and 21 CFR 201.100(f).
- Present the same risk information relating to the major side effects and contraindications concurrently in the audio and visual parts of the presentation for advertising and promotional materials in audio-visual format.
- Be accompanied by the authorized labeling, if the promotional materials are not subject to Section 502(n) of the Act.
- Be submitted to FDA accompanied by Form FDA-2253 at the time of initial dissemination or first use.

If the Agency notifies Lilly that any descriptive printed matter, advertising or promotional materials do not meet the terms set forth in conditions X-Z of this EUA, Lilly must cease distribution of such descriptive printed matter, advertising, or promotional materials in accordance with the Agency's notification. Furthermore, as part of its notification, the Agency may also require Lilly to issue corrective communication(s).

   Y.  No descriptive printed matter, advertising, or promotional materials relating to the use of bamlanivimab and etesevimab under this authorization may represent or suggest that

Page 13 – Eli Lilly and Company

bamlanivimab and etesevimab administered together is safe or effective when used for the treatment or as post-exposure prophylaxis of COVID-19.

Z.  All descriptive printed matter, advertising, and promotional material, relating to the use of bamlanivimab and etesevimab under this authorization clearly and conspicuously shall state that:

- Bamlanivimab and etesevimab have not been approved, but have been authorized for emergency use by FDA under an EUA, for treatment and as post-exposure prophylaxis of COVID-19 in certain adults and pediatric individuals, including neonates, with high risk for progression to severe COVID-19, including hospitalization or death, and

- The emergency use of bamlanivimab and etesevimab is only authorized for the duration of the declaration that circumstances exist justifying the authorization of the emergency use of drugs and biological products during the COVID-19 pandemic under Section 564(b)(1) of the Act, 21 U.S.C. § 360bbb-3(b)(1), unless the declaration is terminated or authorization revoked sooner.

## IV.    Duration of Authorization

This EUA will be effective until the declaration that circumstances exist justifying the authorization of the emergency use of drugs and biological products during the COVID-19 pandemic is terminated under Section 564(b)(2) of the Act or the EUA is revoked under Section 564(g) of the Act.

Sincerely,

--/S/--

_____
Jacqueline A. O'Shaughnessy, Ph.D.
Acting Chief Scientist
Food and Drug Administration



EUA 000100

**GRANTING LETTER-
REVISED FACT SHEET**

GlaxoSmithKline, LLC
Attention: Debra H. Lake, MS
Senior Director, Global Regulatory Affairs
Five Moore Drive
P.O. Box 13398
Durham, NC 27709

Dear Ms. Lake:

Please refer to your Emergency Use Authorization (EUA) authorizing sotrovimab for treatment of mild-to-moderate coronavirus disease (COVID-19) in adults and pediatric patients (12 years of age and older weighing at least 40 kg) with positive results of direct SARS-CoV-2 viral testing, and who are at high risk for progression to severe COVID-19, including hospitalization or death, issued on May 26, 2021, under Section 564 of the Federal Food, Drug, and Cosmetic Act (FDCA) (21 U.S.C. 360bbb-3).

We refer to your submission dated December 22, 2021, to EUA 000100, wherein you submitted proposed revisions to the authorized Fact Sheet for Health Care Providers.

We have completed our review and concur with the following revisions to the Fact Sheet for Health Care Providers:

- Microbiology/Resistance Information (Section 15): Updated with information on susceptibility of the SARS-CoV-2 Omicron (B.1.1.529/BA.1) variant to sotrovimab.
- The box was updated to include a reference to the FDA website for additional information on all products authorized for treatment and prevention of COVID-19.

The updated Fact Sheet for Health Care Providers is attached to this correspondence for your reference. This document must be made available consistent with the terms and conditions of this authorization.

EUA 000100
Page 2

By submitting this amendment for review by the Food and Drug Administration (FDA), you have complied with the Conditions of Authorization stated in the Letter of Authorization for EUA 000100, dated May 26, 2021, authorizing the emergency use of REGEN-COV for treatment of mild-to-moderate COVID-19.

Sincerely,

--/S/--

John Farley, MD, MPH
Director
Office of Infectious Diseases
Center for Drug Evaluation and Research

ENCLOSURE(S):
- Fact Sheet for Healthcare Providers

# EXHIBIT "C"

# Medicare Monoclonal Antibody COVID-19 Infusion Program Instruction

On November 9, 2020, the U.S. Food and Drug Administration (FDA) issued an emergency use authorization (EUA) for the investigational monoclonal antibody therapy, bamlanivimab, for the treatment of mild-to-moderate COVID-19 in adults and pediatric patients with positive COVID-19 test results who are at high risk for progressing to severe COVID-19 and/or hospitalization. Bamlanivimab may only be administered in settings in which health care providers have immediate access to medications to treat a severe infusion reaction, such as anaphylaxis, and the ability to activate the emergency medical system (EMS), as necessary. Review the Fact Sheet for Health Care Providers EUA of Bamlanivimab regarding the limitations of authorized use.

On November 21, 2020, the FDA issued an EUA for the investigational monoclonal antibody therapy, casirivimab and imdevimab, administered together, for the treatment of mild-to-moderate COVID-19 in adults and pediatric patients with positive COVID-19 test results who are at high risk for progressing to severe COVID-19 and/or hospitalization. As with the other monoclonal antibody infusion treatments, casirivimab and imdevimab may only be administered in settings in which health care providers have immediate access to medications to treat a severe infusion reaction, such as anaphylaxis, and the ability to activate the emergency medical system (EMS), as necessary. Review the Fact Sheet for Health Care Providers EUA of Casirivimab and Imdevimab regarding the limitations of authorized use when administered together.

On February 9, 2021, the FDA issued an EUA for the investigational monoclonal antibody therapy, bamlanivimab and etesevimab, administered together, for the treatment of mild-to-moderate COVID-19 in adults and pediatric patients with positive COVID-19 test results who are at high risk for progressing to severe COVID-19 and/or hospitalization. As with the other monoclonal antibody infusion treatments, bamlanivimab and etesevimab may only be administered in settings in which health care providers have immediate access to medications to treat a severe infusion reaction, such as anaphylaxis, and the ability to activate the emergency medical system (EMS), as necessary. Review the Fact Sheet for Health Care Providers EUA of Bamlanivimab and Etesevimab regarding the limitations of authorized use when administered together.

During the COVID-19 public health emergency (PHE), Medicare will cover and pay for these infusions (when furnished consistent with their respective EUAs) the same way it covers and pays for COVID-19 vaccines.

This would allow a broad range of providers and suppliers, including freestanding and hospital-based infusion centers, home health agencies, nursing homes, and entities with whom nursing homes contract for this, to administer these treatments in accordance with the EUA. Medicare will not pay for the COVID-19 monoclonal antibody products that providers receive for free. If providers begin to purchase COVID-19 monoclonal antibody products, Medicare anticipates setting the payment rate for the products, which will be 95% of the average wholesale price (AWP) for many health care providers, consistent with usual vaccine payment methodologies. Additionally, Medicare anticipates establishing codes and rates for the administration of the products.

In order to facilitate the efficient administration of COVID-19 vaccines to SNF residents, CMS will exercise enforcement discretion with respect to certain statutory provisions as well as any associated statutory references and implementing regulations, including as interpreted in pertinent guidance (collectively, "SNF Consolidated Billing Provisions"). Through the exercise of that discretion, CMS will allow Medicare-enrolled immunizers including, but not limited to, pharmacies working with the United States, as well as infusion centers, and home health agencies to bill directly and receive direct reimbursement from the Medicare program for vaccinating Medicare SNF residents.

Health care providers administering the COVID-19 monoclonal antibody infusions will follow the same enrollment process as those administering the other COVID-19 vaccines. Review provider enrollment information.

# Coding for Monoclonal Antibody COVID-19 Infusion

CMS identified specific code(s) for each COVID-19 monoclonal antibody product and specific administration code(s) for Medicare payment:

Eli Lilly and Company's Antibody Bamlanivimab (LY-CoV555), EUA effective November 10, 2020, revised February 9, 2021

Q0239:

- Long descriptor: Injection, bamlanivimab-xxxx, 700 mg
- Short descriptor: bamlanivimab-xxxx
  M0239:

- Long Descriptor: intravenous infusion, bamlanivimab-xxxx, includes infusion and post administration monitoring
- Short Descriptor: bamlanivimab-xxxx infusion


Regeneron's Antibody casirivimab and imdevimab (REGN-COV2) (ZIP), EUA effective November 21, 2020

Q0243:

- Long descriptor: Injection, casirivimab and imdevimab, 2400 mg
- Short descriptor: casirivimab and imdevimab
  M0243:

- Long Descriptor: intravenous infusion, casirivimab and imdevimab includes infusion and post administration monitoring
- Short Descriptor: casirivi and imdevi infusion


Eli Lilly and Company's Antibody Bamlanivimab and Etesevimab, EUA effective February 9, 2021

Q0245:

- Long descriptor: Injection, bamlanivimab and etesevimab, 2100 mg
- Short descriptor: bamlanivimab and etesevima

M0245:

- Long Descriptor: intravenous infusion, bamlanivimab and etesevimab, includes infusion and post administration monitoring
- Short Descriptor: bamlan and etesev infusion


Get the most up to date list of billing codes, payment allowances and effective dates.

# Medicare Payment for Monoclonal COVID-19 Infusion

In order to ensure immediate access during the COVID-19 PHE, Medicare will cover and pay for these infusions in accordance with Section 3713 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). CMS intends to address potential refinements to payment for COVID-19 monoclonal antibody infusions and their administration through future notice and comment rulemaking.

Get the most up to date list of billing codes, payment allowances and effective dates.

### *Payment for Infusion*

Initially, for the infusion of bamlanivimab, casirivimab and imdevimab (administered together), and bamlanivimab and etesevimab (administered together), the Medicare national average payment rate for the administration will be approximately $310. This payment rate is based on one hour of infusion and post-administration monitoring in the hospital outpatient setting. At a later date, we may use a similar methodology to determine the payment rate for the infusion of additional monoclonal antibody products based on the expected infusion time, consistent with the FDA EUA or FDA approval of such products.

### *Payment for Product*

As noted above, Medicare will not provide payment for the COVID-19 monoclonal antibody products that health care providers receive for free, as will be the case upon the product's initial availability in response to the COVID-19 PHE. If health care providers begin to purchase these monoclonal antibody products, CMS anticipates setting the payment rate in the same way we set the payment rate for COVID-19 vaccines. For example, Medicare will pay 95% of AWP for COVID-19 vaccines furnished in the physician office setting, and pay hospital outpatient departments at reasonable cost for COVID-19 vaccines. Because COVID-19 monoclonal antibody products are considered COVID-19 vaccines, they are not eligible for the New COVID-19 Treatments Add-on Payment (NCTAP) under the Inpatient Prospective Payment System (IPPS).

**Note:** We also anticipate addressing coding and payment rates for administration of monoclonal antibody products through future notice-and-comment rulemaking.

Should there be additional products that come to market, get the most up to date list of billing codes, payment allowances and effective dates.

People with Medicare pay no cost sharing for these COVID-19 monoclonal antibody infusion therapy products:

- No copayment/coinsurance
- No deductible

# Billing for Monoclonal Antibody COVID-19 Infusion Administration

Health care providers can bill for the administration of the COVID-19 monoclonal antibody infusion on a single claim for COVID-19 monoclonal antibody administration or submit claims on a roster bill, in accordance with the FDA EUA for each product.

- The EUA for COVID-19 monoclonal antibody treatments contain specific requirements for administration that are considerably more complex than for other services that are billed using roster billing. CMS expects that health care providers will maintain appropriate medical documentation that supports the medical necessity of the service. This includes documentation that supports that the terms of the EUAs are met. The documentation should also include the name of the practitioner who ordered or made the decision to administer the infusion, even in cases where claims for these services are submitted on roster bills.

- When COVID-19 monoclonal antibody doses are provided by the government without charge, providers should only bill for the administration. Health care providers should not include the COVID-19 monoclonal antibody codes on the claim when the product is provided for free.

Health care providers who provide these services to enrollees in a Medicare Advantage Plan should submit claims for monoclonal antibodies to treat COVID-19 that are covered by Part B in accordance with Section 3713 of the CARES Act to Original Medicare for all patients enrolled in Medicare Advantage in 2020 and 2021.

Filing # 217290828 E-Filed 02/21/2025 10:22:03 AM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

EMERALD MULTISPECIALITY P.A.,        Case No.: CACE-25-002412

        Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC.,
MERITAIN HEALTH,
        Defendants.

_____/

## SUMMONS SERVICE ON A CORPORATION
## IMPORTANT

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production, Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**AETNA HEALTH AND LIFE INSURANCE COMPANY**
**c/o CHIEF FINANCIAL OFFICER**
**200 E GAINES ST**
**TALLAHASSEE, FL 32399**

Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney, whose address is set forth below, within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

[4255724/1]

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8950 SW 74th Court, Suite 2201
Miami, FL 33156
Ph: 305-677-2292
Fax: 305-677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

DATED ON _____ FEB 24 2025

CLERK OF THE CIRCUIT COURT

(SEAL)                              By:_____
                                   Deputy Clerk

BRENDA D. FORMAN

Filing # 217290828 E-Filed 02/21/2025 10:22:03 AM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

EMERALD MULTISPECIALITY P.A.,          Case No.: CACE-25-002412

      Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC.,
MERITAIN HEALTH,
      Defendants.

_____/

## SUMMONS SERVICE ON A CORPORATION
### IMPORTANT

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production, Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**AETNA HEALTH ASSURANCE PENNSYLVANIA, INC**
**c/o C T CORPORATION SYSTEM**
**600 N 2nd STREET, SUITE #401**
**HARRISBURG, PA 17101**

Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney, whose address is set forth below, within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

[4255724/1]

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8950 SW 74th Court, Suite 2201
Miami, FL 33156
Ph: 305-677-2292
Fax: 305-677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

DATED ON _____     FEB 24 2025

CLERK OF THE CIRCUIT COURT

(SEAL)                                     By: _____

BRENDA D. FORMAN

[4255724/1]

Filing # 217290828 E-Filed 02/21/2025 10:22:03 AM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

EMERALD MULTISPECIALITY P.A.,                    Case No.: CACE-25-002412

        Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC.,
MERITAIN HEALTH,
        Defendants.

_____/

## SUMMONS SERVICE ON A CORPORATION
## IMPORTANT

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production, Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**AMERICAN CONTINENTAL INSURANCE CO.**
**c/o C T CORPORATION SYSTEM**
**1200 SOUTH PINE ISLAND ROAD**
**PLANTATION, FL 33324**

Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney, whose address is set forth below, within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

[4255724/1]

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8950 SW 74th Court, Suite 2201
Miami, FL 33156
Ph: 305-677-2292
Fax: 305-677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

DATED ON _____     FEB 24 2025

CLERK OF THE CIRCUIT COURT

(SEAL)

By:_____
Deputy

BRENDA D. FORMAN

[4255724/1]

Filing # 217290828 E-Filed 02/21/2025 10:22:03 AM

2 36(0
2|2(|25
(68)

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

EMERALD MULTISPECIALITY P.A.,          Case No.: CACE-25-002412

        Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC.,
MERITAIN HEALTH,
        Defendants.

_____/

## SUMMONS SERVICE ON A CORPORATION
## IMPORTANT

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production, Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**AETNA BETTER HEALTH OF FLORIDA, INC.**
**c/o C T CORPORATION SYSTEM**
**1200 SOUTH PINE ISLAND ROAD**
**PLANTATION, FL 33324**

Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney, whose address is set forth below, within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

[4255724/1]

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8950 SW 74th Court, Suite 2201
Miami, FL 33156
Ph: 305-677-2292
Fax: 305-677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com


DATED ON _      FEB 24 2025

CLERK OF THE CIRCUIT COURT

(SEAL)                                    By:_____
                                          Deputy Clerk


**BRENDA D. FORMAN**

2 JOpm

2|26|25
(68J

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

EMERALD MULTISPECIALITY P.A.,          Case No.: CACE-25-002412

        Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC.,
MERITAIN HEALTH,
        Defendants.

_____/

## SUMMONS SERVICE ON A CORPORATION
## IMPORTANT

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production, Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**MERITAIN HEALTH, INC.**
**d/b/a MERITAIN HEALTH**
**c/o C T CORPORATION SYSTEM**
**1200 SOUTH PINE ISLAND ROAD**
**PLANTATION, FL 33324**

Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney, whose address is set forth below, within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

[4255724/1]

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8950 SW 74th Court, Suite 2201
Miami, FL 33156
Ph: 305-677-2292
Fax: 305-677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

DATED ON _____ 2025.

CLERK OF THE CIRCUIT COU       FEB 24 2025

(SEAL)                                      By:_____
                                           Deputy Clerk

BRENDA D. FORMAN

NOT AN OFFICIAL COPY – CCIS – ATTORNEY OF RECORD

[4255724/1]

Filing # 218714130 E-Filed 03/13/2025 11:29:59 AM

EMERALD MULTISPECIALTY P.A.,

     Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE
CO., AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO.,
AETNA BETTER HEALTH OF FLORIDA,
INC., MERITAIN HEALTH,

     Defendants.

_____/

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO.: CACE-25-002412

### NOTICE OF APPEARANCE AND DESIGNATION OF EMAIL ADDRESSES

David J. DePiano, Esq. and Samantha Kunin, Esq. of the law firm of Fox Rothschild LLP serve notice of their appearance as counsel for Defendants Aetna Health and Life Insurance Co., Aetna Health Assurance Pennsylvania, Inc., American Continental Insurance Co., Aetna Better Health of Florida, Inc., and Meritain Health and request the Clerk of the Court enter same. They further request that copies of all future pleadings, notices, correspondence, and other papers and filings in this cause be directed to the undersigned attorneys.

Furthermore, in accordance with Florida Rule of Judicial Administration 2.516(b)(1)(A), the undersigned counsel designate the following primary and secondary email addresses listed below and request that copies of all future pleadings, notices, correspondence, and other papers and filings filed or served in connection with the action herein be served on them at the primary and secondary email addresses listed below, with such service complying with Rule 2.516(b)(1)(E):

Primary Email Addresses:    David J. DePiano – ddepiano@foxrothschild.com
                           Samantha Kunin – skunin@foxrothschild.com

Secondary Email Addresses:  Nicole Lewis – nlewis@foxrothschild.com
Tracy Dube – tdube@foxrothschild.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to

all counsel of record via the Court's electronic mail service system pursuant to Rule 2.516 and

filed electronically with the Court at www.myflcourtaccess.com this _13th_ day of March, 2025.

FOX ROTHSCHILD LLP
777 S. Flagler Dr., Suite 1700
West Palm Beach, Florida 33401
Tel: (561) 835-9600
Fax: (561) 835-9602


By:      _s/ David J. DePiano_____
DAVID J. DePIANO, ESQ.
Florida Bar No. 0055699
Primary Email: ddepiano@foxrothschild.com
Secondary Emails: nlewis@foxrothschild.com
tdube@foxrothschild.com
SAMANTHA KUNIN, ESQ.
Florida Bar No. 1039990
Email: skunin@foxrothschild.com

*Attorneys for Defendants*

EMERALD MULTISPECIALTY P.A.,

      Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO., AETNA HEALTH ASSURANCE PENNSYLVANIA, INC., AMERICAN CONTINENTAL INSURANCE CO., AETNA BETTER HEALTH OF FLORIDA, INC., MERITAIN HEALTH,

      Defendants.

_____/

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.: CACE-25-002412

## DEFENDANTS' *UNOPPOSED* MOTION FOR ENLARGEMENT OF TIME TO RESPOND TO PLAINTIFF'S COMPLAINT

Defendants Aetna Health and Life Insurance Co., Aetna Health Assurance Pennsylvania, Inc., American Continental Insurance Co., Aetna Better Health of Florida, Inc., and Meritain Health ("Aetna") move pursuant to Fla. R. Civ. P. 1.090 for entry of an unopposed Order enlarging the time for them to respond to Plaintiff Emerald Multispecialty P.A.'s ("Plaintiff") Complaint until April 11, 2025. Aetna provides the following as good cause in support of this enlargement of time:

1.     Aetna's response to Plaintiff's Complaint is presently due by March 18, 2025.

2.     Counsel for Aetna was only recently retained to represent it in this matter.

3.     Due to the press of other matters, as well as the need to investigate the factual allegations before being able to provide a meaningful response to the Complaint, counsel for Aetna requires a brief extension to respond to the Complaint.

4.     Accordingly, there is good cause supporting Aetna's request for a brief enlargement of time to respond to Plaintiff's Complaint.

**WHEREFORE**, Defendants Aetna Health and Life Insurance Co., Aetna Health Assurance

Pennsylvania, Inc., American Continental Insurance Co., Aetna Better Health of Florida, Inc., and Meritain Health respectfully request entry of an unopposed Order enlarging the amount of time to respond to Plaintiff's Complaint until April 11, 2025 and awarding Aetna any other appropriate relief.

## <u>CERTIFICATION PURSUANT TO FLORIDA RULE OF CIVIL PROCEDURE 1.202</u>

Prior to filing this motion, counsel for Aetna conferred with counsel for Plaintiff, Maria T. Santi, Esq., regarding the relief requested in this motion on March 12, 2025 by email. Counsel for Plaintiff advised that Plaintiff **does not oppose** Aetna's requested extension until April 11, 2025 to respond to the Complaint.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to all counsel of record via the Court's electronic mail service system pursuant to Rule 2.516 and filed electronically with the Court at www.myflcourtaccess.com this __13th__ day of March, 2025.

> FOX ROTHSCHILD LLP
> 777 S. Flagler Dr., Suite 1700
> West Palm Beach, Florida 33401
> Tel: (561) 835-9600
> Fax: (561) 835-9602
>
>
> By:      *s/ David J. DePiano*
>           DAVID J. DePIANO, ESQ.
>           Florida Bar No. 0055699
>           Primary Email: ddepiano@foxrothschild.com
>           Secondary Emails: nlewis@foxrothschild.com
>                                     tdube@foxrothschild.com
>           SAMANTHA KUNIN, ESQ.
>           Florida Bar No. 1039990
>           Email: skunin@foxrothschild.com
>
>           *Attorneys for Defendants*

Filing # 217989307 E-Filed 03/04/2025 09:11:34 AM

## <u>RETURN OF SERVICE</u>

State of Florida                    County of Broward                    Circuit Court

Case Number: CACE-25-002412

Plaintiff:
**EMERALD MULTISPECIALITY P.A**

vs.

Defendant:
**AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC., and
MERITAIN HEALTH**

For:
Maria Santi, Esq

Received by DLE Process Servers, Inc on the 25th day of February, 2025 at 2:35 pm to be served on
**AETNA HEALTH AND LIFE INSURANCE COMPANY c/o Chief Financial Officer, 200 E Gaines Street,
Tallahassee, FL 32399**.

I, Santiago Almaguer, do hereby affirm that on the **26th day of February, 2025** at **5:15 pm, I:**

Served a **CORPORATION** by uploading the following documents electronically via the Florida Department
of Financial Services Portal in compliance with Florida Statutes HB 959, §24(3)(2022), § 624.422(3):
**Summons, Complaint and Demand For Jury Trial, Exhibits.** and on 2/28/2025 the office of the Chief
Financial Officer forwarded the documents by electronic delivery to the designated agent of **AETNA
HEALTH AND LIFE INSURANCE COMPANY**

I certify that I am over the age of 18 and have no interest in the above action.

_____
Santiago Almaguer
Process Server

**DLE Process Servers, Inc**
936 Sw 1st Avenue
#261
Miami, FL 33130
(786) 220-9705

Our Job Serial Number: DLE-2025010458

Copyright © 1992-2025 DreamBuilt Software, Inc.  Process Server's Toolbox V9.0a

2/26/25  5:15pm
email
SA.

Filing # 217290828 E-Filed 02/21/2025 10:22:03 AM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

EMERALD MULTISPECIALTY P.A.,     Case No.: CACE-25-002412

       Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC.,
MERITAIN HEALTH,
       Defendants.

_____/

## SUMMONS SERVICE ON A CORPORATION
## IMPORTANT

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production,
Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**AETNA HEALTH AND LIFE INSURANCE COMPANY**
**c/o CHIEF FINANCIAL OFFICER**
**200 E GAINES ST**
**TALLAHASSEE, FL 32399**

 Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney,
whose address is set forth below, within 20 days after service of this summons on that defendant,
exclusive of the day of service, and to file the original of the defenses with the clerk of this court
either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so,
a default will be entered against that defendant for the relief demanded in the Complaint.

{4255724/1}

*** FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 02/21/2025 10:22:01 AM ****

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8950 SW 74th Court, Suite 2201
Miami, FL 33156
Ph: 305-677-2292
Fax: 305-677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

DATED ON _____ FEB 24 2025

CLERK OF THE CIRCUIT COURT

(SEAL)

By:_____
Deputy Clerk

BRENDA D. FORMAN

[4255723/1]

Filing # 217793845 E-Filed 02/28/2025 10:45:08 AM

AFFIDAVIT OF SERVICE

| Case:<br>CACE-25-<br>002412 | Court:<br>In the Circuit Court of the 17th Judicial Circuit in and<br>for Broward County, Florida | Job:<br>12781387 (2025010461) |
|---|---|---|
| Plaintiff / Petitioner:<br>EMERALD MULTISP ECIALITY P.A., | | Defendant / Respondent:<br>AETNA HEALTH AND LIFE INSURANCE CO., AETNA HEALTH<br>ASSURANCE PENNSYLVANIA, INC., AMERICAN CONTINENTAL<br>INSURANCE CO., AETNA BETTER HEALTH OF FLORIDA, INC.,<br>MERITAIN HEALTH |
| Received by:<br>Harris Investigations, LLC | | For:<br>dle |
| To be served upon:<br>AETNA HEALTH ASSURANCE PENNSYLVANIA, INC c/o CT Corporation System | | |

I, Kevin Sepulveda, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

Recipient Name / Address:   AETNA HEALTH ASSURANCE PENNSYLVANIA, INC c/o CT Corporation System, 600 North 2nd Street Suite 401, Harrisburg, PA 17101

Manner of Service:   Registered Agent, Feb 26, 2025, 9:46 am EST

Documents:   Summons, Complaint and Demand For Jury Trial, Exhibits (Received Feb 25, 2025 at 4:31pm EST)

Additional Comments:
1) Successful Attempt: Feb 26, 2025, 9:46 am EST at 600 North 2nd Street Suite 401, Harrisburg, PA 17101 received by AETNA HEALTH ASSURANCE PENNSYLVANIA, INC c/o CT Corporation System. Age: 53; Ethnicity: Caucasian; Gender: Female; Weight: 168; Height: 5'6"; Hair: Gray; Eyes: Green; Other: Went to stated address and handed paperwork to Tina Cristini intake specialist.

_____   02/26/2025
Kevin Sepulveda          Date
ID # 1033

Harris Investigations, LLC
PO Box 304
Lansdale, Pa 19446
301-401-1235

Subscribed and sworn to before me by the affiant who is
personally known to me.

_____
Notary Public

2/26/2025         _____
Date                Commission Expires

Commonwealth of Pennsylvania - Notary Seal
Danielle E. Herring, Notary Public
Schuylkill County
My commission expires January 10, 2029
Commission number 1042621
Member, Pennsylvania Association of Notaries

Filing # 217290828 E-Filed 02/21/2025 10:22:03 AM

*2/26/25*
*9:46AM*
*Tina C.*
*U.S.*
*#1033*

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

EMERALD MULTISPECIALITY P.A.,          Case No.: CACE-25-002412

        Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC.,
MERITAIN HEALTH,
        Defendants.
_____/

## SUMMONS SERVICE ON A CORPORATION
## IMPORTANT

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production, Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**AETNA HEALTH ASSURANCE PENNSYLVANIA, INC**
**c/o C T CORPORATION SYSTEM**
**600 N 2nd STREET, SUITE #401**
**HARRISBURG, PA 17101**

Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney, whose address is set forth below, within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

[4255724/1]

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8950 SW 74th Court, Suite 2201
Miami, FL 33156
Ph: 305-677-2292
Fax: 305-677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

DATED ON _____        FEB 24 2025

CLERK OF THE CIRCUIT COURT

(SEAL)                                    By: _____

BRENDA D. FORMAN

[4255724/1]

Filing # 217692987 E-Filed 02/27/2025 10:02:14 AM

CHIEF FINANCIAL OFFICER
JIMMY PATRONIS
STATE OF FLORIDA

EMERALD MULTISPECIALITY P.A.

PLAINTIFF(S)

VS.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE PENNSYLVANIA,
INC., AMERICAN CONTINENTAL INSURANCE
CO., AETNA BETTER HEALTH OF FLORIDA,
INC., AND MERITAIN HEALTH

DEFENDANT(S)
_____/

SUMMONS, COMPLAINT

**CASE #:** **CACE-25-002412**
**COURT:** **17TH JUDICIAL CIRCUIT**
**COUNTY:** **BROWARD**
**DFS-SOP #:** 25-000051700

# <u>NOTICE OF SERVICE OF PROCESS</u>

NOTICE IS HEREBY GIVEN of acceptance of Service of Process by the Chief Financial Officer of the State of Florida. Said process was received in my office by ELECTRONIC DELIVERY on Tuesday, February 25, 2025 and a copy was forwarded by ELECTRONIC DELIVERY on Wednesday, February 26, 2025 to the designated agent for the named entity as shown below.

AMERICAN CONTINENTAL INSURANCE COMPANY
DONNA MOCH
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324

**\*Our office will only serve the initial process (Summons and Complaint) or Subpoena and is not responsible for transmittal of any subsequent filings, pleadings, or documents unless otherwise ordered by the Court pursuant to Florida Rules of Civil Procedure, Rule 1.080.**

Jimmy Patronis
Chief Financial Officer

MARIA T SANTI
ATTORNEY
HEALTH AND MEDICINE LAW FIRM
8950 SW 74TH CT STE 2201
MIAMI, FL 33156

JM1

Office of the General Counsel - Service of Process Section
200 East Gaines Street - P.O. Box 6200 - Tallahassee, FL 32314-6200 - (850)413-4200

Filing # 217698816 E-Filed 02/27/2025 10:39:04 AM

## **RETURN OF SERVICE**

| | | |
|---|---|---|
| **State of Florida** | **County of Broward** | **Circuit Court** |

Case Number: CACE-25-002412

Plaintiff: **EMERALD MULTISPECIALITY P.A**
vs.
Defendant: **AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC., and
MERITAIN HEALTH**

For:
Maria Santi, Esq

Received by DLE Process Servers, Inc on the 25th day of February, 2025 at 2:35 pm to be served on
**AETNA BETTER HEALTH OF FLORIDA, INC c/o CT Corporation System, 1200 South Pine Island Rd,
Plantation, FL 33324.**

I, Carlos Vila Escobar, do hereby affirm that on the **26th day of February, 2025** at 2:30 pm, I:

served a **CORPORATION** by delivering a true copy of the **Summons, Complaint and Demand For Jury Trial,
Exhibits.** at **1200 South Pine Island Rd, Plantation, FL 33324** with the date and hour of service endorsed thereon
by me, to: **Donna Moch** as **SOP** for **Ct Corporation System, REGISTERED AGENT** on behalf of **AETNA
BETTER HEALTH OF FLORIDA, INC** and informing said person of the contents therein, in compliance state
statutes.

I certify that I am over the age of 18, have no interest in the above action, and am a Special Process
Server, in good standing, in the judicial circuit in which the process was served.

Under penalties of perjury, I declare that I have read the foregoing Verified Return of Service and that the
facts stated are true. F.S. 92.525. NOTARY NOT REQUIRED PURSUANT TO F.S. 92.525

Carlos Vila Escobar
SPS 1685

**DLE Process Servers, Inc
936 Sw 1st Avenue
#261
Miami, FL 33130
(786) 220-9705**

Our Job Serial Number: DLE-2025010455

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a

Filing # 217290828 E-Filed 02/21/2025 10:22:03 AM

```
DELIVERED  2/26/2025 2:30 PM
SERVER     CV
LICENSE    SPS 1683
```

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

EMERALD MULTISPECIALITY P.A.,                Case No.: CACE-25-002412

        Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC.,
MERITAIN HEALTH,
        Defendants.

                                   /

## SUMMONS SERVICE ON A CORPORATION
## IMPORTANT

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production,
Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**AETNA BETTER HEALTH OF FLORIDA, INC.**
**c/o C T CORPORATION SYSTEM**
**1200 SOUTH PINE ISLAND ROAD**
**PLANTATION, FL 33324**

Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney,
whose address is set forth below, within 20 days after service of this summons on that defendant,
exclusive of the day of service, and to file the original of the defenses with the clerk of this court
either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so,
a default will be entered against that defendant for the relief demanded in the Complaint.

[4255724/1]

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8950 SW 74th Court, Suite 2201
Miami, FL 33156
Ph: 305-677-2292
Fax: 305-677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com

DATED ON _        FEB 24 2025

CLERK OF THE CIRCUIT COURT

(SEAL)                     By:_____
                              Deputy Clerk

BRENDA D. FORMAN

[4255724/1]

Filing # 217698820 E-Filed 02/27/2025 10:39:06 AM

## RETURN OF SERVICE

| State of Florida | County of Broward | Circuit Court |
|---|---|---|

Case Number: CACE-25-002412

Plaintiff: **EMERALD MULTISPECIALITY P.A**
vs.
Defendant: **AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC., and
MERITAIN HEALTH**

For:
Maria Santi, Esq

Received by DLE Process Servers, Inc on the 25th day of February, 2025 at 2:35 pm to be served on **MERITAIN HEALTH, INC d/b/a MERITAIN HEALTH c/o CT Corporation System, 1200 South Pine Island Rd, Plantation, FL 33324.**

I, Carlos Vila Escobar, do hereby affirm that on the **26th day of February, 2025** at 2:30 pm, I:

served a **CORPORATION** by delivering a true copy of the **Summons, Complaint and Demand For Jury Trial, Exhibits.** at **1200 South Pine Island Rd, Plantation, FL 33324** with the date and hour of service endorsed thereon by me, to: **Donna Moch** as **SOP** for **Ct Corporation System, REGISTERED AGENT** on behalf of **MERITAIN HEALTH, INC d/b/a MERITAIN HEALTH** and informing said person of the contents therein, in compliance state statutes.

I certify that I am over the age of 18, have no interest in the above action, and am a Special Process Server, in good standing, in the judicial circuit in which the process was served.

Under penalties of perjury, I declare that I have read the foregoing Verified Return of Service and that the facts stated are true. F.S. 92.525. NOTARY NOT REQUIRED PURSUANT TO F.S. 92.525

**Carlos Vila Escobar**
SPS 1683

**DLE Process Servers, Inc
936 Sw 1st Avenue
#261
Miami, FL 33130
(786) 220-9705**

Our Job Serial Number: DLE-2025010459

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a

Filing # 217290828 E-Filed 02/21/2025 10:22:03 AM

| DELIVERED | 2/26/2025 2:30 PM |
| SERVER | CV |
| LICENSE | SPS 1683 |

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

EMERALD MULTISPECIALITY P.A.,                 Case No.: CACE-25-002412

        Plaintiff,

vs.

AETNA HEALTH AND LIFE INSURANCE CO.,
AETNA HEALTH ASSURANCE
PENNSYLVANIA, INC., AMERICAN
CONTINENTAL INSURANCE CO., AETNA
BETTER HEALTH OF FLORIDA, INC.,
MERITAIN HEALTH,
        Defendants.

_____/

## SUMMONS SERVICE ON A CORPORATION
## IMPORTANT

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE:

YOU ARE HEREBY COMMANDED to serve this Summons, Request for Production, Interrogatories, and a copy of the Complaint, on the below-named Defendant(s).

**MERITAIN HEALTH, INC.**
**d/b/a MERITAIN HEALTH**
**c/o C T CORPORATION SYSTEM**
**1200 SOUTH PINE ISLAND ROAD**
**PLANTATION, FL 33324**

Each defendant is required to serve written defenses to the complaint on Plaintiff's attorney, whose address is set forth below, within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

[4255724/1]

**MARIA T. SANTI, ESQ.**
Florida Bar No. 117564
**HEALTH AND MEDICINE LAW FIRM**
*Counsel for Plaintiff*
8950 SW 74th Court, Suite 2201
Miami, FL 33156
Ph: 305-677-2292
Fax: 305-677-2306
Service email:
admin@healthandmedicinelawfirm.com
Attorney email:
msanti@healthandmedicinelawfirm.com


DATED ON _____ 2025.

CLERK OF THE CIRCUIT CO          FEB 24 2025

(SEAL)                          By:_____
                                Deputy

BRENDA D. FORMAN

[4255724/1]